COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Fitzpatrick, Judges Benton, Elder, Frank, Humphreys, Clements, Felton,
          McClanahan, Haley and Retired Judge Bumgardner[*]
Argued at Richmond, Virginia


ELISA KENTY ROBINSON

v.      Record No. 2474-03-2

COMMONWEALTH OF VIRGINIA                          OPINION BY
                                          JUDGE ROBERT J. HUMPHREYS
GEORGE FISHER ROBINSON                         JANUARY 31, 2006

v.      Record No. 2539-03-2

COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Paul M. Peatross, Jr., Judge

Francis McQ. Lawrence (Rhonda Quagliana; St. John, Bowling &
Lawrence, LLP, on briefs), for appellant Elisa Kenty Robinson.

Robert E. Byrne, Jr. (Jonathan T. Wren; Martin & Raynor, P.C., on
briefs), for appellant George Fisher Robinson.

Donald E. Jeffrey III, Assistant Attorney General (Judith Williams
Jagdmann, Attorney General; Karri B. Atwood, Assistant Attorney
General, on briefs), for appellee.


Appellants George F. Robinson and Elisa K. Robinson (collectively, "the Robinsons")

appeal their multiple convictions for contributing to the delinquency of a minor, a violation of

Code § 18.2-371. Elisa Robinson contends that the trial court erred in denying her motion to

suppress, reasoning that, because the investigating police officer was located in the curtilage of

        [*] Judge Bumgardner participated in the hearing and decision of this case prior to the
effective date of his retirement on December 31, 2005.

their home when he witnessed the illicit activity, the resulting search violated her Fourth Amendment right to be free from unreasonable searches and seizures. George Robinson, in contrast, argues that, although the police officer did not violate the Fourth Amendment when he initially entered the premises, the officer lacked the exigent circumstances necessary to permit his further intrusion onto the property. For the following reasons, we disagree with both appellants' arguments and, therefore, affirm their convictions.

## I. BACKGROUND

In accord with our usual standard of review, on the appeal of a denial of a motion to suppress, we view the evidence and all reasonable inferences flowing from the evidence in a light most favorable to the Commonwealth, the party prevailing below. Garcia v. Commonwealth, 40 Va. App. 184, 189, 578 S.E.2d 97, 99 (2003); Sabo v. Commonwealth, 38 Va. App. 63, 69, 561 S.E.2d 761, 764 (2002). So viewed, the evidence in this case establishes the following.

On August 16, 2002, the Albemarle County Police Department received three separate telephone calls reporting an alleged underage drinking party at the Robinsons' home. Corporal Scott Cox was dispatched to investigate these allegations, and he arrived at the Robinsons' home at approximately 11:00 p.m. From the state road in front of the house, Officer Cox saw between ten and twenty cars parked on the state road, and he also saw two or three cars parked on the left-hand side of the driveway. From that position, Officer Cox could also see the house, the front porch, the front door, and the front yard, although he could not see the backyard or the end of the driveway. The floodlights above the front door were turned on, and the lights along the sidewalk leading to the front door were also illuminated.

Officer Cox, who was driving a marked police car with its headlights on, "got on the radio" and told the other officers in the area to "start heading this way" because "[i]t appears that

there's a party." Officer Cox then turned into the driveway and started to drive towards the house. Almost immediately after pulling into the driveway, Officer Cox saw several additional parked vehicles near the right side of the driveway, as well as "several parked vehicles near the side of the house." Officer Cox continued up the driveway in his police car. From his position inside the police car, he began to see some "activity" in the backyard. Before reaching the point where the walkway to the front door intersects with the Robinsons' driveway, Officer Cox saw two individuals holding clear beer bottles. The individuals, both of whom appeared to be underage, were standing by a pine tree about seven or eight yards away from Officer Cox's police car. The two juveniles "looked at [Officer Cox], looked at the house, yelled 'cops,' dropped the beer bottles, and ran down a fence line toward the woods." Officer Cox then pulled his police vehicle behind a car parked by the garage, and he looked to his left. From that vantage point, "[h]e saw juveniles running toward the woods." Also, "[h]e could see a patio table covered with beer bottles and noticed beer bottles strewn about the backyard." Officer Cox got out of his car, "yelled for people to stop running, and radioed other officers who were waiting off the property that kids were running east into the woods."

After radioing the other officers, Officer Cox proceeded into the backyard "to look for the juvenile host." According to Officer Cox, he went into the backyard because he "[w]anted to find out what was going on, [and] find out who the people were that were running away," because he "was worried for their safety." After speaking with one of the party attendees, Officer Cox then "walk[ed] up to the back door of [the] house" and knocked on a clear glass sliding door. From outside the residence, he could see "two adults sitting at the kitchen table."

The Robinsons were arrested, and each was charged with nineteen counts of contributing to the delinquency of a minor. Both parties filed a motion to suppress, contending that Officer Cox was unlawfully present on their property when he viewed the illicit activity.

During the suppression hearing, Officer Cox testified that his police car was next to a bush planted by the front sidewalk when he "clearly" saw "two male juveniles standing on the other side of the tree holding beer bottles." To clarify the position in the driveway from which the officer observed the juveniles, the trial court asked Officer Cox, "So you were at the bush when you saw the two individuals?" Officer Cox responded, "That's right."

By letter opinion dated August 4, 2003, the trial court held that Officer Cox "planned to enter the property to investigate the allegations of underage consumption of alcohol." The trial court also observed that, "[a]s Cox went down the driveway, he could not see the backyard or the garage," but that "[h]e could see the house, the front yard, and the front porch." Additionally, the trial court found that "[t]here were no signs posted"—such as a "no trespassing" sign—at the entrance to the driveway.

Based on this evidence, the trial court found that the Robinsons' driveway was not part of the curtilage of the house and, therefore, concluded that "Cox's presence there [did] not implicate the Fourth Amendment." The court additionally held that Officer Cox's presence in the Robinsons' driveway was justified by the officer's right to conduct a "knock and talk," that is, to approach a home and knock on the front door to speak with an occupant. Under either of the preceding rationales, the trial court concluded that "Cox was in a lawful place in the driveway" when he observed the two juveniles drinking beer, and his observations were therefore admissible pursuant to the plain view exception to the warrant requirement. Finally, the trial court concluded that Officer Cox's entry into the backyard was justified because he had both probable cause to believe that a crime was being committed and exigent circumstances "given the likelihood of evidence being destroyed and juveniles running away." Accordingly, the trial court denied the Robinsons' motions to suppress.

The trial court convicted each appellant of nine counts of contributing to the delinquency of a minor. Both parties appealed their convictions to this Court.

## II. PROCEDURAL HISTORY

On appeal, a three-judge panel, with one judge dissenting, affirmed the Robinsons' convictions. See Robinson v. Commonwealth, 45 Va. App. 592, 612 S.E.2d 751 (2005). The panel majority reasoned that, although the driveway was part of the curtilage of the home, Officer Cox's presence did not violate any reasonable expectation of privacy, and, therefore, his conduct did not implicate the Fourth Amendment. See id. By orders dated June 21, 2005, this Court granted the Robinsons' petitions for rehearing *en banc* and stayed the mandates of the panel opinion. See Elisa Robinson v. Commonwealth, 46 Va. App. 24, 614 S.E.2d 667 (2005); George Robinson v. Commonwealth, 46 Va. App. 23, 614 S.E.2d 667 (2005).

During the *en banc* oral arguments, the Commonwealth conceded that Officer Cox was located on the curtilage of the Robinsons' home when he observed the unlawful activity. Accordingly, this question—which was in dispute before the three-judge panel, see Robinson, 45 Va. App. at 604-07, 612 S.E.2d at 757-58—is no longer at issue on appeal. However, the Commonwealth maintains that, although Officer Cox intruded upon the curtilage, he did not violate the Fourth Amendment because, for the reasons stated in the majority panel opinion, the Robinsons lacked a reasonable expectation of privacy in the area from which he viewed the illegal activity.[1]

Also during the *en banc* oral arguments, George Robinson conceded that he lacked a reasonable expectation of privacy in their driveway on the night in question. He argues,

---

[1] Upon rehearing *en banc*, the Commonwealth has apparently abandoned its argument that the Robinsons lacked a reasonable expectation of privacy in their driveway because portions of the driveway were viewable from the state road. Cf. Robinson, 45 Va. App. at 608-09, 612 S.E.2d at 759.

however, that the officer's further intrusion onto the property was unconstitutional, reasoning that the officer—once his suspicions of underage drinking had been validated—should have left the property or otherwise secured the premises and then obtained a search warrant. This argument was not previously raised before the three-judge panel and, thus, was not addressed in the panel opinion.[2]

Elisa Robinson, in contrast, continues to maintain that she possessed a reasonable expectation of privacy in the driveway and, thus, argues that Officer Cox violated the Fourth Amendment when he entered the property without a warrant. However, Elisa Robinson concedes that, if the officer was legitimately present on the premises when he witnessed the illegal activity, the officer's further intrusion onto the property was justified because the officer possessed the requisite exigent circumstances.[3]

### III. ANALYSIS

Although "'[w]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them,' . . . we review *de novo* the trial court's application of legal standards . . . to the particular facts of the case." McCracken v. Commonwealth, 39

---

[2] George Robinson's new argument—that the officer lacked the exigent circumstances necessary to permit his entry into the backyard—was not argued before the three-judge panel either on brief or during oral arguments. Indeed, it is questionable whether Robinson properly assigned error to the trial court's clear ruling that the officer's entry was constitutional because he possessed both probable cause and exigent circumstances. Specifically, the third assignment of error in Robinson's "Questions Presented," as enunciated in his petition for appeal, merely questions "Whether the 'plain view' doctrine authorized Sergeant Cox's entry into the Robinsons' backyard to seize evidence there." Notably absent from this assignment of error is any mention of exigent circumstances or probable cause. However, because the assignment of error does question whether the officer's "entry into the Robinsons' backyard" was constitutionally permissible, we will assume for purposes of this opinion that Robinson's third "Question Presented" is sufficient to encompass the trial court's ruling that exigent circumstances justified the officer's entry into the backyard.

[3] Of the three parties, then, Elisa Robinson is the only litigant who maintains a position consistent with that taken before the three-judge panel.

Va. App. 254, 258, 572 S.E.2d 493, 495 (2002) (*en banc*) (quoting McGee v. Commonwealth, 25

Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*)) (citing Ornelas v. United States, 517

U.S. 690, 699 (1996)).  Further, "[i]n reviewing a trial court's denial of a motion to suppress,

'the burden is upon [the appellant] to show that the ruling . . . constituted reversible error.'"

McGee, 25 Va. App. at 197, 487 S.E.2d at 261 (quoting Fore v. Commonwealth, 220 Va. 1007,

1010, 265 S.E.2d 729, 731 (1980)).

For the reasons that follow, we hold that, contrary to Elisa Robinson's position, Officer

Cox did not violate the Fourth Amendment when he drove up the driveway of the Robinsons'

home.  We further hold that, contrary to George Robinson's position, once the officer observed

the teenagers fleeing from the backyard, his further intrusion onto the property was permissible

pursuant to the exigent circumstances exception to the warrant requirement.  Accordingly, we

affirm both parties' convictions.

### A.  Elisa Robinson:  Implied Consent

Upon rehearing *en banc*, Elisa Robinson[4] maintains that Officer Cox violated the Fourth

Amendment when he entered the driveway of the property without first obtaining a search

warrant.  Initially, we agree that, "absent (1) exigent circumstances and probable cause or

(2) consent, law enforcement agents cannot enter the curtilage of a person's home either to

search or seize without previously obtaining a warrant."  Jefferson v. Commonwealth, 27

Va. App. 1, 16, 497 S.E.2d 474, 481 (1998).  Although Officer Cox possessed neither probable

cause nor exigent circumstances which would justify a search when he initially entered the

property, we hold that, on the night in question, Robinson impliedly consented to have members

of the public—including police officers—enter the premises in an attempt to contact the

---

[4] For purposes of this subsection, Elisa Robinson will be referred to simply as "Robinson."

residents of that property.  Because Officer Cox had not exceeded the scope of this implied

consent when he viewed the illicit activity, we affirm her convictions.

1.

It is generally recognized that, absent any affirmative attempts to discourage trespassers,

owners or possessors of private property impliedly consent to have members of the general

public intrude upon certain, limited areas of their property.  As we have noted,

> "People commonly have different expectations, whether
> considered or not, for the access areas of their premises than they
> do for more secluded areas.  Thus, we do not place things of a
> private nature on our front porches that we may very well entrust
> to the seclusion of a backyard, patio or deck.  In the course of
> urban life, we have come to expect various members of the public
> to enter upon such a driveway, e.g., brush salesmen, newspaper
> boys, postmen, Girl Scout cookie sellers, distressed motorists,
> neighbors, friends.  Any one of them may be reasonably expected
> to report observations of criminal activity to the police."

Shaver v. Commonwealth, 30 Va. App. 789, 796, 520 S.E.2d 393, 397 (1999) (quoting State v.

Corbett, 516 P.2d 487, 490 (Or. Ct. App. 1973)).

This invitation, where it exists, extends only to those areas of the property that would be

used when approaching the residence in an ordinary attempt to speak with the occupants.  See id.

Thus, areas of the curtilage that a visitor could reasonably be expected to cross when

approaching the front door—for example, the driveway, front sidewalk, and front porch—are

generally exempted from Fourth Amendment protection.  See, e.g., State v. Clark, 859 P.2d 344,

349 (Idaho Ct. App. 1993) ("There is an implied invitation for the public to use access routes to

the house, such as parking areas, driveways, sidewalks, or pathways to the entry, and there can

be no reasonable expectation of privacy as to observations which can be made from such

areas.").  As a result, if the property owner has impliedly consented to have members of the

public use a particular "path" when attempting to access his home, he has waived any reasonable

expectation of privacy in areas of the curtilage associated with that "path."  See id.

- 8 -

By extension, the same implied consent is extended to police officers who enter the curtilage and, while on the premises, restrict their conduct to those activities reasonably contemplated by the homeowner. See Shaver, 30 Va. App. at 796, 520 S.E.2d at 397 ("'If one has a reasonable expectation that various members of society may enter the property in their personal or business pursuits, he should find it equally likely that the police will do so.'" (quoting Corbett, 516 P.2d at 490)); see also State v. Cada, 923 P.2d 469, 477 (Idaho Ct. App. 1996) ("[T]he direct access routes to the house, including parking areas, driveways and pathways to the entry, are areas to which the public is impliedly invited, and [] police officers restricting their activity to such areas are permitted the same intrusion and the same level of observation as would be expected from a 'reasonably respectful citizen.'"); State v. Gabbard, 877 P.2d 1217, 1221 (Or. Ct. App. 1994) ("An officer's right to go to the front door of a house is based on implied consent to allow visitors to take reasonable steps to make contact with the occupant.").[5] Accordingly, "[w]hen police enter onto private property . . . and restrict their entry to places that other visitors would be expected to go, such as walkways, driveways, or porches, any observation made from these areas is permissible under the Fourth Amendment." Trimble v. State, 816 N.E.2d 83, 88 (Ind. Ct. App. 2004); see also State v. Maxfield, 886 P.2d 123, 134 (Wash. 1994) ("If a law enforcement officer or agent does not go beyond the area of the residence that is impliedly open to the public, such as the driveway, the walkway, or an access route leading to the residence, no privacy interest is invaded.").

The landowner's implied consent is generally presumed to exist absent evidence of an affirmative intent to exclude the public from the premises. See, e.g., People v. Kozlowski, 505 N.E.2d 611, 612 (N.Y. 1987) ("Absent evidence of intent to exclude the public, the entryway to a

---

[5] See generally 1 Wayne R. LaFave, Search and Seizure § 2.3(f), at 600-03 (4th ed. 2004).

person's house offers implied permission to approach and knock on the front door."); State v.

Somfleth, 8 P.3d 221, 227 (Or. Ct. App. 2000) ("A homeowner can abrogate the presumption of

implied consent to approach the front door by undertaking sufficient steps to exclude casual

visitors from the front yard."). Here, then, we must consider whether, under the totality of the

circumstances, Robinson affirmatively intended to exclude members of the public from her

premises. See generally State v. Wyatt, 961 P.2d 653, 656 (Idaho Ct. App. 1998) ("The

determination whether a particular citizen had a legitimate expectation of privacy depends upon

the unique facts of each case. We therefore examine the citizen's efforts to protect his own

privacy from observation by the general public, taking into account norms of social conduct and

the nature of the premises.").[6]

Factors that may be particularly relevant to this determination include, *inter alia*:

(1) whether the homeowner has erected any physical barriers, such as gates or fences, across the

entrance to the property, and (2) whether the homeowner has posted signs, such as "no

trespassing" or "private property" signs, indicating a desire to exclude the public from the

premises. See, e.g., State v. Christensen, 953 P.2d 583 (Idaho 1998) (no implied invitation to

enter where the entrance to the driveway was obstructed by a closed gate posted with a "no

---

[6] We note that the issue of whether a property owner gave law enforcement officers free and voluntary consent to search the premises is a question of fact. See, e.g., Hargraves v. Commonwealth, 37 Va. App. 299, 307, 557 S.E.2d 737, 741 (2002) ("The presence of consent is, however, a factual question."). Here, however, we are not questioning whether Robinson extended her consent to *search* the property, but rather, whether, under the totality of the circumstances, she had rescinded her implied consent to *enter* that property. Because the existence of this implied consent is presumed to exist absent evidence of an affirmative intent to exclude the public from the premises, see Somfleth, 8 P.3d at 227, the implied invitation to enter arises by operation of law. Accordingly, the issue of whether, under the totality of the circumstances, Robinson impliedly consented to have members of the public enter her property is a mixed question of law and fact that is properly reviewable on appeal. See id. at 225 (where the relevant facts were undisputed, classifying the issue of whether property owner extended his implied consent for members of the public to enter his backyard as "purely legal").

trespassing" sign); State v. Pacheo, 101 S.W.3d 913, 919 (Mo. Ct. App. 2003); State v. McIntyre, 860 P.2d 299, 301 (Or. Ct. App. 1993) ("[C]ourts must consider all surrounding circumstances, including the existence of a fence, to determine the residents' intent."); State v. Ridgway, 790 P.2d 1263, 1265 (Wash. Ct. App. 1990) (holding that marijuana recovered from doorstep should have been suppressed because police observed the marijuana after walking around a closed gate and evading guard dogs while approaching the house).

Here, Robinson did not erect any physical barriers barring entry onto her property. There were no gates, fences, wires, highway cones, or other obstacles indicating that members of the public were not welcome to use the driveway and front sidewalk in an effort to speak with the occupants of the premises. Nor did she post any signs indicating that the public in general—or police officers in particular—were not welcome to enter the property and approach the front door. Considering the totality of the circumstances, we conclude that, on the night in question, Robinson impliedly consented to have members of the general public—including law enforcement officers—enter the driveway and front sidewalk of her premises.

2.

Although we hold that Robinson extended an implied invitation to the public to enter her property and approach the front door, we must also consider whether Officer Cox's conduct on the night of the party exceeded the scope of that implied consent. Ultimately, whether the officer exceeded the scope of the implied consent "cannot be determined by a fixed formula," but must instead "be based on the facts and circumstances of each case." People v. Thompson, 270 Cal. Rptr. 863, 874 (Cal. Ct. App. 1990).[7]

---

[7] Relevant factors that have been identified include "whether the officer (1) spied into the house; (2) acted secretly; (3) approached the house in daylight; (4) used the normal, most direct route to the house; (5) attempted to talk with the resident; (6) created an artificial vantage point; and (7) made the discovery accidentally." State v. Ross, 959 P.2d 1188, 1190 (Wash. Ct. App. 1998).

- 11 -

"[U]nder normal circumstances, uninvited visitors coming to a residence to speak with an owner or resident are expected to come to the residence's most direct, obvious, and prominent entryway, which in most cases is the front door." Trimble, 816 N.E.2d at 88. These visitors "are also expected to leave by the same route after knocking on the front door and receiving no response," unless the "nature of the circumstances surrounding the visit" indicate that the visitor "could reasonably be expected to seek out residents through areas other than the front door." Id. Generally, "a substantial and unreasonable departure from the normal access route will exceed the scope of the implied invitation and intrude upon a constitutionally protected privacy interest." Clark, 859 P.2d at 350.

Similarly, entering the property late at night, especially if accompanied by the use of subterfuge, may exceed the scope of the implied invitation. As noted by one court,

> Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm. As compared to open daytime approaches, surreptitious searches under the cover of darkness create a greater risk of armed response—with potentially tragic results—from fearful residents who may mistake the police officers for criminal intruders.

Cada, 923 P.2d at 478; see also Brown v. State, 392 So. 2d 280, 284 (Fla. Dist. Ct. App. 1980) (finding that police violated defendant's reasonable expectation of privacy when they entered defendant's driveway without a warrant at 1:45 a.m. and arrested him); State v. Cloutier, 544 A.2d 1277, 1280 (Me. 1998) (noting that "the implied invitation extends only to recognized access routes . . . and to *reasonable times of day*" (emphasis added)); State v. Myers, 815 P.2d 761, 769 (Wash. 1991) (noting that whether a police officer enters a premises during the daylight hours is relevant in determining whether the scope of the implied consent has been exceeded).

Also, although law enforcement officers who "enter areas of the curtilage which are impliedly open" to the public are "free to keep their eyes open," State v. Seagull, 632 P.2d 44, 47

- 12 -

(Wash. 1981), an officer who implements an overly intrusive means of investigation, such as the use of binoculars or other sensory-enhancing devices, may exceed the scope of the implied consent. See Cada, 923 P.2d at 477 ("The scope of the implied invitation to enter areas of the curtilage that provide direct access to the house . . . may be exceeded where officers employ a particularly intrusive method of viewing."); Cloutier, 544 A.2d at 1280 (holding that the defendant had no reasonable expectation of privacy in a marijuana plant where, *inter alia*, the officer "detected the contraband by means of his natural senses"). But cf. State v. Lee, 633 P.2d 48, 51 (Utah 1981) ("[T]he use of a flashlight to assist the natural vision at night does not make an 'observation' a 'search.'").

Here, considering the totality of the circumstances, we conclude that Officer Cox did not exceed the scope of Robinson's implied consent to enter the premises and approach the front door of her home. Officer Cox entered the driveway, began to drive toward the residence, and, *before* he reached the area of the driveway where the front walk intersects with the driveway, he saw the minors drinking in the backyard. At that point, Officer Cox had gone no further than any member of the public would have gone in an attempt to contact the owners of the property. He did not stray from the "path" leading directly from the road to the front door (i.e., the driveway and the front sidewalk), nor did he attempt to conduct a general search of the premises through use of an overly intrusive means of investigation.

Moreover, although Officer Cox parked his police car in the parking area by the garage, those portions of the curtilage impliedly open to the public encompass areas "that other visitors would be expected to go," Trimble, 816 N.E.2d at 88, including "parking areas" in which a visitor might reasonably be expected to leave his vehicle when attempting to contact the residents of the property. See Cada, 923 P.2d at 477 ("[T]he direct access routes to the house, *including parking areas*, driveways and pathways to the entry, are areas to which the public is

- 13 -

impliedly invited . . . ." (emphasis added)); Clark, 859 P.2d at 349 ("There is an implied invitation for the public to use access routes to the house, *such as parking areas*, driveways, sidewalks, or pathways to the entry . . . ." (emphasis added)). Because the parking area by the garage is at the end of the driveway and directly adjacent to the front sidewalk, Robinson could reasonably expect a visitor to park his vehicle in that area when attempting to contact the residents of the home. Accordingly, Officer Cox did not exceed the scope of the implied consent when he pulled his car into the parking area by the garage.

Also, although Officer Cox entered the curtilage of Robinson's home at 11:00 p.m., a late hour of the evening, this entry did not necessarily exceed the scope of the implied consent. "Under some circumstances, the mere fact that the intrusion was made late at night may be a factor suggesting that the police conduct was unduly intrusive." State v. Morris, 961 P.2d 653, 657 n.3 (Idaho Ct. App. 1998). Here, however, the lights along Robinson's front sidewalk and the lights on the front porch were still illuminated. Also, multiple cars were parked along the driveway and on the public road in front of the house. These factors give rise to a reasonable inference that the landowner's implied consent to approach the front door of the residence had not yet been rescinded for the night.[8] Also, we note that Officer Cox drove up the driveway with his headlights turned on—the same way that any member of the general public would presumably have approached the house—rather than using subterfuge or the "cover of darkness" in an attempt to disguise his approach. Compare Cada, 923 P.2d at 478 (officers exceeded scope of implied consent where they engaged in a "clandestine intrusion . . . under cover of darkness in the dead of night"), with Clark, 859 P.2d at 346 (officers did not exceed scope of implied consent where the officers went to the front door of the residence at 10:00 p.m. to investigate a

---

[8] This inference is supported by the fact that various members of the public had, in fact, approached the residence and "crashed" the party on the night in question.

- 14 -

neighbor's complaint about a loud party).[9]  Considering the totality of the circumstances, we conclude that, on the night in question, the implied invitation to enter Robinson's premises was still open even at this late hour, and Officer Cox did not exceed the scope of this implied consent when he drove up Robinson's driveway and parked his car in the parking area by the garage.

Robinson argues, however, that Officer Cox's subjective intent—specifically, to see if the party attendees "scattered" as he approached the house—renders the entry unconstitutional, reasoning that the officer subjectively intended to conduct a general search of the premises. Because a homeowner who impliedly consents to have law enforcement officers enter the property does not also consent to a general search of that property, Robinson concludes that Officer Cox exceeded the scope of the implied consent by entering the premises while subjectively intending to search the property.

Initially, we agree that, although a property owner's implied consent generally authorizes law enforcement officers to seek out the occupants of the residence in order to "investigate," see, e.g., United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir. 2001) ("Law enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants."), the scope of this implied consent does not also encompass the right to conduct a general search of the premises, see, e.g., United States v. Bradshaw, 490 F.2d 1097, 1100 (4th Cir. 1974) (noting that the officer may not extend the scope of the implied consent to conduct "a search of such premises"); see also Rogers v. Pendleton, 249 F.3d 279, 288 (4th Cir. 2001); Alvarez v. Montgomery County, 147 F.3d 354, 358 (4th Cir. 1998).  Thus, if a law enforcement

---

[9] See also Morris, 961 P.2d at 657 n.3 (noting that the "late hour" was "not such a factor in this case," reasoning that "[i]f the investigation had been delayed until the next day, the [subject of the investigation] might have been gone"); Ross, 959 P.2d at 1191 (finding that the officers exceeded the scope of an implied invitation where "the officers arrived in an unmarked car, in plain clothes, after midnight, and made no attempt to contact [the defendant] or otherwise notify him of their presence").

- 15 -

officer, while searching for evidence of illicit activity, strays from the "path" that is impliedly open to the public, he has exceeded the scope of the implied consent and, as a result, violated the Fourth Amendment.

However, the determination of whether a Fourth Amendment violation has occurred is based on "'an objective assessment of the officer's actions . . . and not on the officer's state of mind at the time the challenged action was taken.'" Limonja v. Commonwealth, 8 Va. App. 532, 538, 383 S.E.2d 476, 480 (1989) (*en banc*) (quoting Maryland v. Macon, 472 U.S. 463, 470-71 (1985)); see also Deer v. Commonwealth, 17 Va. App. 730, 734, 441 S.E.2d 33, 36 (1994) ("Attention must be focused on objective reasonableness rather than on the police officer's subjective intent."). Although cases from other jurisdictions have inquired into whether the officer subjectively intended to search the property, we note that, in each of those cases, the officer's subjective intent only became relevant if the officer exceeded the ordinary scope of the implied consent by, for example, invading other areas of the curtilage *after* attempting a "knock and talk." See, e.g., Estate of Smith v. Marasco, 318 F.3d 497, 520-21 (3d Cir. 2003) (remanding qualified immunity case for further factual determinations where the officers knocked on the front door, the defendant failed to answer, and the officers then entered the backyard of the residence); Alvarez, 147 F.3d at 357 (inquiring into officer's subjective purpose for entering the backyard where the officers, who were investigating an underage drinking party, approached the front door, noticed a sign that said "Party in Back," and then went to the backyard to "speak with the party's host").

Here, however, Officer Cox had not yet performed a "knock and talk," nor had he invaded any areas of the curtilage other than those associated with the "path" to the front door. Indeed, when Officer Cox first viewed the illicit activity, he had not yet finished driving up the driveway. Under the circumstances of this case, then, there is no additional intrusion into the

curtilage that would necessitate an inquiry into whether Officer Cox subjectively intended to conduct a general search of the property when he first entered the driveway. Accordingly, we hold that Officer Cox's subjective intent is irrelevant under the circumstances of this case. See Edwards v. Commonwealth, 38 Va. App. 823, 827, 568 S.E.2d 454, 456 (2002) ("The United States Supreme Court has articulated the standard for measuring the scope of an individual's consent under the Fourth Amendment to be '*objective* reasonableness . . . .'" (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991) (internal quotation marks omitted) (emphasis added))); see also McIntyre, 860 P.2d at 302 (holding that "[t]he trial court's reliance on the officers' investigative purpose was misplaced" because "'[c]riminal investigation is as legitimate a societal purpose as is census taking or mail delivery'" (quoting Corbett, 516 P.2d at 490) (second alteration in original)); cf. Krause v. Penny, 837 F.2d 595, 597 (2d Cir. 1988) (dismissing qualified immunity suit where "a reasonable officer . . . might [] have [objectively] believed that [the plaintiff] consented to his presence in the driveway").

Thus, considering the totality of the circumstances, we conclude that, on the night of the party, Robinson impliedly consented to have members of the public—including law enforcement officers—enter her driveway. We further conclude that Officer Cox did not exceed the scope of this implied consent because, by driving up the driveway and parking in the parking area, he went no further than an ordinary member of the public would have gone in an attempt to contact the occupants of the premises. Accordingly, because Robinson extended an implied invitation to enter the property, and because Officer Cox did not exceed the scope of that implied consent, the Fourth Amendment had not been implicated at the point in time when the officer observed the individuals drinking beer and then fleeing into the woods.

Because Officer Cox was legitimately present on the property when he viewed the illegal activity, and because Robinson presents no further arguments in support of her position that the

- 17 -

trial court should have granted her motion to suppress,[10] we hold that the trial court did not err in denying the motion to suppress. Accordingly, we affirm her convictions.

### B. George Robinson: Probable Cause and Exigent Circumstances

Counsel for George Robinson[11] contends, however, that, once Officer Cox confirmed his suspicion that underage individuals were consuming alcoholic beverages, the officer should have immediately left or otherwise secured the premises and then obtained a search warrant. Any further intrusion into the property, Robinson reasons, including the "search and seizure subsequently conducted in the . . . backyard," violated the Fourth Amendment because the officer lacked the exigent circumstances sufficient to justify the warrantless entry onto the property. For the reasons that follow, we disagree.

As Robinson argues, it is true that, "absent (1) exigent circumstances and probable cause or (2) consent, law enforcement agents cannot enter the curtilage of a person's home either to search or seize without previously obtaining a warrant." Jefferson, 27 Va. App. at 16, 497 S.E.2d at 481. Here, as discussed in Part III(A), *supra*, and as Robinson concedes, Officer Cox's initial intrusion into the curtilage was justified because Robinson—by extending an implied invitation to members of the public to enter his driveway—impliedly consented to that limited intrusion. The only remaining question that must be resolved, then, is whether Officer Cox, once he had observed the minors drinking beer and fleeing into the woods, could intrude further into the curtilage without violating Robinson's constitutional rights. Under the circumstances of this case, we conclude that the entry was justified.

---

[10] During oral arguments, Elisa Robinson conceded that, if Officer Cox was legitimately present on the driveway, his subsequent entry into the backyard would be permissible because the officer had both probable cause and exigent circumstances.

[11] For purposes of this subsection, George Robinson will be referred to simply as "Robinson."

- 18 -

Initially, we note that the facts, when viewed in the light most favorable to the Commonwealth, establish that Officer Cox did not exceed the scope of Robinson's implied consent until *after* he had observed the underage individuals drinking alcohol and then fleeing from the scene. Specifically, as discussed above, Robinson had impliedly consented for members of the public to intrude upon certain, limited areas of the curtilage, including the driveway, the sidewalk, the area of the driveway immediately adjacent to the sidewalk, and the parking area at the end of the driveway. Thus, Officer Cox, who was located "at the bush" when he "clearly" saw "two male juveniles standing on the other side of the tree holding beer bottles," had not exceeded the scope of the implied consent when he initially viewed the illegal activity. And, before Officer Cox could proceed significantly further up the driveway,[12] the individuals "looked at [Cox], . . . looked . . . towards the back of the house, [] yelled 'cops,' . . . dropped their beer bottles[,] and [then] ran down [the] fence line, towards the woods." It was only then that Officer Cox parked his car, got out of the police vehicle, and entered the backyard.

Considering these facts, the trial court found that Officer Cox's subsequent intrusion into the backyard was justified because he possessed both probable cause and exigent circumstances.[13] We agree. Clearly, once the officer observed the seemingly underage

[12] Robinson argues that, because Cox "had continued traveling the entire time that these observations were being made," this Court must find, of necessity, that Officer Cox had "penetrated the privacy line" when the juveniles first noticed the police vehicle and then fled. The record is silent on the issue of Officer Cox's exact location when the juveniles dropped their beer bottles and ran into the woods. However, as discussed in Part III(A)(2), *supra*, Officer Cox had not yet exceeded the scope of Robinson's implied consent when he parked his police vehicle in the parking area by the garage. Thus, even if Officer Cox did not observe the fleeing juveniles until after he had pulled into the parking area, he had not yet exceeded the scope of the implied invitation.

[13] Specifically, the trial court found that the Commonwealth had established probable cause because: (1) "there were three calls concerning the possibility of underage drinking," (2) there were ten to twenty cars "parked in front of the home," and (3) the officer observed two individuals holding clear beer bottles who "dropped the bottles and ran after yelling 'cops.'" The trial court further held that the Commonwealth had established exigent circumstances "given the

- 19 -

individuals holding beer bottles and then fleeing from the police presence, he had probable cause

to believe that a crime was being committed.  See, e.g., Code § 4.1-305(A) (providing that "[n]o

person" under the age of 21 "shall consume, purchase or possess, or attempt to consume,

purchase or possess, any alcoholic beverage"); see also State v. Jangala, 961 P.2d 246, 247 (Or.

Ct. App. 1998) (holding that a law enforcement officer had probable cause to believe the crime

of furnishing alcohol to a minor was taking place after the officer observed a group of people

who appeared to be minors "holding red plastic cups that [the officer] recognized as the type

commonly used to serve beer from a keg").[14]  The only remaining issue, then, is whether exigent

circumstances justified the warrantless entry.

As noted by the Virginia Supreme Court, factors to consider when determining whether

exigent circumstances justified a warrantless entry include:

> (1) the degree of urgency involved and the time required to get a
> warrant; (2) the officers' reasonable belief that contraband is about
> to be removed or destroyed; (3) the possibility of danger to others,
> including police officers left to guard the site; (4) information that
> the possessors of the contraband are aware that the police may be
> on their trail; (5) whether the offense is serious, or involves
> violence; (6) whether officers believe the suspects are armed;
> (7) whether there is, at the time of entry, a clear showing of
> probable cause; (8) whether the officers have strong reason to
> believe the suspects are actually present in the premises; (9) the
> likelihood of escape if the suspects are not swiftly apprehended;
> and (10) the suspects' recent entry into the premises after hot
> pursuit.

---

likelihood of evidence being destroyed and juveniles running away," reasoning that "there was a high likelihood that the party would disperse quickly and evidence be destroyed once the juveniles or the Robinsons knew the police were on the property," further noting that "persons not detained by Corporal Cox would be likely to destroy evidence of the party immediately."

[14] Indeed, as already noted, Robinson conceded the issue of probable cause during oral arguments, focusing instead on whether the officer had exigent circumstances sufficient to justify his warrantless entry.

Verez v. Commonwealth, 230 Va. 405, 410-11, 337 S.E.2d 749, 753 (1985); see also Cherry v. Commonwealth, 44 Va. App. 347, 360, 605 S.E.2d 297, 303 (2004). Moreover, in evaluating whether exigent circumstances justified a warrantless entry, we concern ourselves with "what an objectively reasonable officer on the scene could have believed." United States v. Leveringston, 397 F.3d 1112, 1116 (8th Cir.), cert. denied, 126 S. Ct. 159 (2005). "If such an officer would have had sufficient grounds to believe there was an exigency, then the Fourth Amendment does not require a warrant." Id.

Here, there is ample evidence in the record to support the trial court's finding that exigent circumstances justified the warrantless entry. Specifically, Officer Cox could reasonably have believed that multiple, underage individuals had gathered at a party in the country and consumed significant quantities of alcohol. Many of these individuals had driven to the residence and, if left to their own devices pending issuance of a search warrant, may have attempted to drive home, placing both themselves and the general public at risk of significant harm. See, e.g., Radloff v. City of Oelwein, 380 F.3d 344, 348 (8th Cir. 2004) (holding that "[e]xigent circumstances existed . . . because of the threat to public safety if the juveniles left the house in cars while under the influence of alcohol," further noting that "[i]t would have been unreasonable . . . to require the officers to quarantine the juveniles' cars during the period of time it would have taken to obtain a warrant"), cert. denied, 125 S. Ct. 967 (2005); see also Howes v. Hitchcock, 66 F. Supp. 2d 203, 216 (D. Mass. 1999) (holding that the police officers could have reasonably believed exigent circumstances existed where, *inter alia*, the officers were aware of the "risk to public safety posed by the possibility of the [intoxicated, underage] partygoers getting into their cars" and driving away).

Also, upon sighting the police vehicle, several of the partygoers fled into the woods, not only creating a risk of harm to themselves but also a risk that evidence (specifically, their

identities and blood alcohol levels) would be forever lost. Moreover, Officer Cox could reasonably have believed that, had he left the premises to secure a search warrant, there was a significant likelihood that the remaining partygoers—who were, at that point, aware of the police presence—would either flee or destroy physical evidence in an attempt to "cover up" the existence of the underage drinking party. See, e.g., Howes, 66 F. Supp. 2d at 215 (holding that "the threat of destruction of evidence was sufficient to permit the warrantless entry" where "an objectively reasonable police officer . . . could have concluded that . . . many of the besotted teenagers would have fled" once they became aware of the police presence, and "[o]thers would have attempted to destroy or at least conceal evidence of the teenagers' drinking had the officers waited patiently to obtain a warrant"); Jangala, 961 P.2d at 247-48 (noting that "evidence of the crime of furnishing alcohol to minors is easily destroyed," and concluding that, because the officers "were aware that the evidence that they needed to seize was easily destroyed, combined with the fact that partygoers were aware of the police presence and had either run from the scene or otherwise attempted to avoid detection, there were exigent circumstances supporting the warrantless entry").[15] Considering the totality of the circumstances, we hold that the exigencies of this situation were sufficient to authorize Officer Cox's warrantless entry into Robinson's backyard.

Moreover, we disagree with Robinson's argument that this situation is one in which the investigating officer "manufactured the exigency." It is well settled that, where law enforcement officers "create the exigency themselves, warrantless activity is per se unreasonable and we require suppression of any evidence obtained thereby." United States v. Webster, 750 F.2d 307, 328 (5th Cir. 1984). However, as we have noted, law enforcement officers "'are under no duty

---

[15] Indeed, the record reflects that Elisa Robinson at one point "told several juveniles to swallow vinegar in order to fool the [breathalyzer]."

to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.'" Cherry, 44 Va. App. at 360-61, 605 S.E.2d at 303 (quoting United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991) (internal quotations omitted)); see also Carwell v. Lewis, 417 U.S. 583, 595 (1974) ("[W]e know of no case or principle that suggests that the right to search on probable cause and . . . under exigent circumstances [is] foreclosed if a warrant was not obtained at the first practicable moment."). Thus, where the exigencies arise during the course of a continued investigation, those exigencies will not be deemed "manufactured" unless the officer had a meaningful opportunity to obtain a search warrant prior to the development of the exigencies upon which he relied. See, e.g., Webster, 750 F.2d at 327 ("Our first concern in analyzing a claim of manufactured exigency is whether agents could have obtained a search warrant prior to the development of the exigent circumstances upon which they relied."); see also United State v. Cucci, 892 F. Supp. 775, 788 (W.D. Va. 1995) ("[A] postponement in obtaining a warrant is appropriate when the purpose for the delay is to 'ferret out any hitherto unknown individuals involved in the illicit undertakings, gather additional evidence substantiating the crimes believed to have been committed, or discover any other offenses in which the suspects are involved.'" (quoting United States v. Hultgren, 713 F.2d 79, 87 (5th Cir. 1983))).

Despite Robinson's argument to the contrary, then, Officer Cox was "under no duty" to leave the premises "the moment" he had the "minimum evidence to establish probable cause." Cherry, 44 Va. App. at 360-61, 605 S.E.2d at 303. And, as discussed above, negligible time passed between the moment that Officer Cox "clearly" saw "two male juveniles standing on the other side of the tree holding beer bottles," and the moment that these individuals became aware of his presence and fled. Because the development of probable cause and the creation of the

- 23 -

exigencies were virtually contemporaneous, Officer Cox had no meaningful opportunity in which to obtain a search warrant for the property before exigent circumstances necessitated his further intrusion onto the premises. Accordingly, we conclude that the "manufactured exigency" doctrine is inapplicable under the circumstances of this case. See Webster, 750 F.2d at 328 (declining to hold "that agents manufactured exigent circumstances by placing the [property] under surveillance" while attempting to gather further information).

For these reasons, we hold that the trial court did not err in concluding that the officer had both probable cause and exigent circumstances sufficient to justify his warrantless entry into Robinson's backyard. Thus, we affirm the denial of his motion to suppress.

IV. CONCLUSION

We hold that, under the facts of this case, the Robinsons extended an implied invitation to members of the public to enter the driveway and approach the front door of the residence. Because the Robinsons impliedly consented to the initial, limited intrusion, Officer Cox's presence on the driveway did not constitute an illegal search. Moreover, once he observed the underage individuals drinking beer and fleeing into the woods, Officer Cox's further intrusion onto the property was justified because he possessed both probable cause and exigent circumstances. Because Officer Cox did not violate the Fourth Amendment, we hold that the trial court properly denied the Robinsons' motions to suppress. Accordingly, we affirm their convictions for contributing to the delinquency of a minor.

Affirmed.

Bumgardner, J., with whom McClanahan, J., joins, concurring.

I concur in the result but do not join the opinion because it rules too broadly. The officer was lawfully on the defendants' property when he observed ongoing crimes. That knowledge permitted him to pursue and arrest the crimes being committed.

Elder, J., concurring, in part, and dissenting, in part.

I concur in the majority's ruling, based on the Commonwealth's concession, that Officer Cox was in the curtilage of the Robinsons' home when he first viewed probable illegal activity in the form of underage drinking. However, I disagree with the majority that Officer Cox's entry onto the curtilage was reasonable under the facts of this case. I believe it is the subjective intent of *the citizen* regarding whether to waive a constitutional right that ultimately controls. The legal fiction that implied consent exists for the police to enter the curtilage of a private residence for a knock-and-talk has never been held by the United States or Virginia Supreme Court to override the pronouncement of Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2031, 36 L. Ed. 2d 854 (1973), that assessing the voluntariness of consent to a search is to be judged from the subjective perspective of the particular citizen involved. Because the evidence fails to prove either (1) that anyone with a reasonable expectation of privacy in the Robinsons' curtilage in fact consented to Officer Cox's entry thereon or (2) that Officer Cox could reasonably have concluded, under the facts of this case, that those with a reasonable expectation of privacy would have consented if asked, I would hold the evidence fails to support the trial court's conclusion that Officer Cox's presence on the Robinsons' property was reasonable and did not violate the Fourth Amendment's pronouncement against unreasonable searches. Thus, I respectfully dissent from the majority's affirmance of the Robinsons' convictions.

The majority states, "Here, . . . we are not questioning whether Robinson extended her consent to *search* the property, but rather, whether, under the totality of the circumstances, she had rescinded her implied consent to *enter* that property." Settled principles establish that Officer Cox's entry onto the Robinsons' property, in and of itself, was a search within the meaning of the Fourth Amendment's reasonableness requirement, see, e.g., United States v. Dunn, 480 U.S. 294, 301, 107 S. Ct. 1134, 1139, 94 L. Ed. 2d 326, 334 (1987), albeit one

arguably less intrusive than an entry or actual search of the dwelling itself. The majority concludes the entry was reasonable based on the existence of what it finds was the homeowners' implied consent "to have members of the general public—including law enforcement officers—enter the driveway and front sidewalk," parts of the property they could be expected to cross if entering for purposes of a "knock and talk."

Although Fourth Amendment issues are generally judged by standards of the objective reasonableness of a police officer's beliefs or actions, not all Fourth Amendment issues are judged by such standards. See, e.g., Kyer v. Commonwealth, 45 Va. App. 473, 481 n.2, 612 S.E.2d 213, 217 n.2 (2005) (en banc) (noting community caretaker standard considers officer's subjective intent). This case presents an example of the inherent tension between the general Fourth Amendment standard for assessing the reasonableness of an officer's actions and the standard for determining whether an individual has consented to a search. The United States Supreme Court has held that the test for determining the voluntariness of a consent to search is based on the subjective intent of the individual claimed to have waived his right to be free from unreasonable searches. See Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2047-48, 36 L. Ed. 2d at 862-63; see also United States v. Wilson, 895 F.2d 168, 171 (4th Cir. 1990) (comparing objective standard for determining whether seizure has occurred with subjective standard for determining consent to search).

Under a subjective test, the fact that the Robinsons did not take affirmative steps to exclude *all* trespassers does not establish that they subjectively intended to consent to *police* entry onto the curtilage of their property for purposes of a knock-and-talk or any other purpose. Neither the United States nor the Virginia Supreme Court has ever held, as the majority of our Court does today, that "implied consent [to entry by *the police* for a knock-and-talk] is presumed to exist absent evidence of an affirmative intent to exclude *the public* from the premises," see

- 27 -

discussion, *supra*, at 10 n.6 (citing State v. Somfleth, 8 P.3d 221, 227 (Or. Ct. App. 2000)) (emphasis added), or that "[an] implied invitation [to enter for such a purpose] arises by operation of law," see id.

Here, the police made no claim that the Robinsons gave actual consent to have the police enter the curtilage of their home on the night at issue. Officer Cox testified that the police made no attempt to contact the Robinsons' home by telephone or any other means before driving onto the property that night. The fact that the Robinsons had not posted "no trespassing" signs and may have consented, if asked, to allow other members of society such as letter carriers and Girl Scouts onto the curtilage does not mean that they would, if asked, have granted the same privilege to the police on the night at issue. Thus, if the entry is to be judged purely from the subjective perspective of the homeowner, the absence of actual consent ends the inquiry.

At most, then, the Commonwealth might claim that, although Officer Cox lacked actual consent, his entry onto the curtilage did not violate the Fourth Amendment because a reasonable officer would have believed those having a reasonable expectation of privacy in the curtilage did consent or would have consented, if asked, to have the police enter for a knock-and-talk on the night at issue. Cf. Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803-04, 114 L. Ed. 2d 297, 302 (1991) (holding "[t]he standard for measuring *the scope* of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (emphasis added)); Illinois v. Rodriguez, 497 U.S. 177, 185-86, 110 S. Ct. 2793, 2799-2800, 111 L. Ed. 2d 148, 159-60 (1990) (holding that general rule that officer's assessments of fact need not always be correct as long as they are reasonable applies to officer's assessment of whether party giving consent to search has authority to do so); United States v. Smith, 395 F.3d 516, 519 (4th Cir. 2005) ("[T]he Fourth Amendment does not even require that the suspect *actually* consent to a

- 28 -

government search; factual determinations by the government, such as the presence of consent, must be *reasonable*, but are not required always to be correct."). I believe the objective reasonableness of an officer's assessment of whether a homeowner has consented should not be relevant when the issue deals with protecting one's Fourth Amendment rights in his home and its curtilage. See, e.g., Ronald Bacigal, Choosing Perspectives in Criminal Procedure, 6 Wm. & Mary Bill of Rts. J. 677, 729 (1998). As one commentator has opined,

> The fundamental right of individuals to control their own fate by exercising or waiving constitutional rights must take precedence over a police officer's mistaken perception of consent, no matter how objectively reasonable or understandable the mistake may have been. From the police perspective, the only sensible guide is that "they should never rely on consent as the basis for a search unless they must. If they do search relying on consent, they should be prepared to meet a heavy burden of proof that consent was in fact meaningfully given. And even then, because of the difficulties of proof, they should expect to be told often that the search was not proper."

Id. (quoting Lloyd L. Weinreb, Generalities of the Fourth Amendment, 42 U. Chi. L. Rev. 47, 64 (1976)).

Nevertheless, even if we examine whether Officer Cox could reasonably, albeit erroneously, have believed those having a reasonable expectation of privacy in the curtilage would have consented to his entry, if asked, we must conclude the entry violated the Fourth Amendment. The evidence fails as a matter of law to support a finding that Officer Cox could reasonably have believed *these particular citizens* would have consented to his entry on the night at issue. Under the facts of this case, both the adult homeowners and any juveniles who resided with them had a reasonable expectation of privacy in the home and the portions of the curtilage not viewable from the public road. See, e.g., State v. Reddick, 541 A.2d 1209, 1213-14 (Conn. 1988) (holding adult child legitimately residing in home of parent has reasonable expectation that home will be free of government intrusion); see also Grant v. State, 589 S.W.2d 11, 14 (Ark.

1979) (recognizing implicitly that, absent parental consent for search, child has reasonable expectation of privacy in premises in which he resides with parent). Officer Cox went to the property that night because the police had received multiple reports that an underage drinking party was underway at the Robinsons' home. Under these circumstances, Officer Cox could not reasonably have concluded that either (a) the Robinsons, if they were at home, or (b) "the juvenile host" of the party, if the Robinsons were not present,[16] would have consented to entry of the police on the curtilage, where they could readily discover evidence of criminal activity not visible from the public road.[17]

For these reasons, I would hold the evidence fails to support the majority's conclusion that implied consent justified the entry of the Robinsons' curtilage. Further, absent evidence (1) that anyone with a reasonable expectation of privacy in the Robinsons' curtilage in fact consented to Officer Cox's entry thereon or (2) that Officer Cox could reasonably have concluded, under the facts of this case, that those with a reasonable expectation of privacy would have consented if asked, I would hold that Officer Cox's presence on the Robinsons' property was unreasonable and violated the Fourth Amendment's pronouncement against unreasonable searches. Thus, I respectfully dissent from the majority's affirmance of the Robinsons' convictions.

---

[16] Officer Cox testified that he was searching for the party's juvenile host and appeared to have believed, at least after he confirmed that underage drinking was occurring, that he would not find any adults present.

[17] Although a reasonable person test presupposes an innocent person, see, e.g., Florida v. Bostick, 501 U.S. 429, 438, 111 S. Ct. 2382, 2388, 115 L. Ed. 2d 389 (1991) (applying principle in evaluating objective test for determining whether suspect was illegally seized), a subjective test, such as the test for consent to search, must take into consideration an individual's guilty knowledge. Although guilty persons may be found to have given valid consent to search, even though such consent is against their self-interest, see United States v. Mendenhall, 446 U.S. 544, 555, 559, 100 S. Ct. 1870, 1878, 1880, 64 L. Ed. 2d 497, 510, 513 (1980), it is not objectively reasonable for an officer to assume, without asking, that a person he suspects is guilty of engaging in some criminal activity on his property would consent to law enforcement entry onto the curtilage if asked.

Benton, J., dissenting.

"[A] search or seizure carried out on . . . [residential] premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971). See also Katz v. United States, 389 U.S. 347, 357 (1967). This principle applies to entries and searches within "the curtilage . . . [, which] has been considered part of the home itself for Fourth Amendment purposes." Oliver v. United States, 466 U.S. 170, 180 (1984). Thus, the Robinsons' driveway, a part of their home's curtilage, was a place where they could "legitimately demand privacy" from illegitimate police intrusion. Id. at 178. The Commonwealth failed to prove that police officers' warrantless entry and search onto the curtilage of the Robinsons' residence falls within the "jealously and carefully drawn" exceptions to the Fourth Amendment's warrant requirement. Jones v. United States, 357 U.S. 493, 499 (1958).

No evidence in this record establishes that the police officers went to the Robinsons' residence to "knock and talk." The evidence proved that Sergeant Allen of the Albemarle Police Department "was . . . placed in charge of a potential investigation of an underage drinking party." At his direction, Officer Scott Cox, a corporal, went to the property at 11:00 p.m. to "investigate" the party without any plan to first go to the front door to make inquiries. Indeed, the trial judge found that Officer Cox "planned to enter the property to investigate the allegations of underage consumption of alcohol."

Officer Cox testified about the plan the officers prepared before going to the residence. In response to the prosecutor's questions, Officer Cox explained the plan:

> Q: And what was the plan? You were going to go onto the property, and then what was going to happen?
>
> A: I was just going to take the investigation further.

He further testified that "Sergeant Allen suggested that [Officer Cox] go first to investigate" while other police officers remained in their vehicles a half mile away, waiting for information from him. Officer Cox did not testify that the plan included an inquiry at the front door of the residence. Indeed, the facts patently establish that was not part of the plan. When Officer Cox drove toward the residence and was still on the public highway, he saw cars in the driveway, "got on the radio and . . . said [to the other waiting officers], 'Please start heading this way. It appears there's a party.'" At that point, he had seen no juveniles drinking alcohol. Nor had he seen any people at the residence.

Officer Cox then drove up the driveway "to investigate further," explaining his plan as follows:

> Q: Isn't it correct that you have described the situation you were hoping to observe as the effect when you flick on a light in a dark kitchen, and the cockroaches scatter?
>
> A: Right.
>
> Q: So you were looking for a reaction of people scattering to confirm your suspicion that you had an underage drinking party.
>
> A: Right.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> Q: Officer Cox, isn't it true that it was not your intent to walk to the front door and knock on it, as you proceeded up that driveway that night?
>
> A: My intent when I drove up the driveway was to establish probable cause, to investigate the scene further.

When Officer Cox saw "two people that *appeared* to be juveniles" holding beer bottles in the backyard, he continued to drive past the walkway that led to the front door and stopped his vehicle "as far back on the asphalt as [he] possibly could." Officer Cox stopped at a place from which he could see into the backyard. He testified he "wanted to identify [the two people], to find out what their age was, and to see if it was alcohol." Officer Cox testified that when the two

- 32 -

people dropped the bottles and scattered, his suspicion about who they were and what they were holding caused him to believe it was probable that they were underage and drinking alcohol. When he exited his vehicle, he "got on the radio, and . . . told everybody . . . that the kids were running east . . . into the woods." He then went into the backyard as the "backup [officers] were coming to assist" because he "was looking for the juvenile hosting the party."

The sergeant's plan of action and Officer Cox's conduct on the driveway all establish that they were not there to "knock and talk" and that they went beyond any implied invitation to be on the property. "[N]o . . . right exists" for a police officer to enter upon the curtilage of a person's home to conduct an investigation merely because the officer had a reasonable suspicion of criminal activity. Rogers v. Pendleton, 249 F.3d 279, 289 (4th Cir. 2001). Although the police officer may walk to the front door of a residence to knock and speak to a resident, limitations exist upon the officer's conduct. Id.[18]

> [T]he right to "knock and talk," that is, to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants, [is] not the right to make a general investigation in the curtilage based on reasonable suspicion. A contrary rule would

---

[18] Obviously, the occupants of a residence have not issued an implied invitation to the public to enter the premises to search or rummage around or to engage in illegitimate conduct.

> A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises *for the very purposes contemplated by the occupant*. Of course, this does not mean that, whenever entry is obtained by invitation . . . an agent is authorized to conduct a general search for incriminating materials.

Lewis v. United States, 385 U.S. 206, 211 (1966). Thus, when, as here, an officer enters the curtilage "to establish probable cause to investigate the scene further," his intrusion does not fall within the property owner's implied invitation to the public. See Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329 (1979) (holding that "there is no basis for the notion that because a [property owner] invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees").

> eviscerate the principle . . . that the curtilage is entitled to the same
> level of Fourth Amendment protection as the home itself.

Id.

Simply put, the government failed to meet its "heavy burden" to show this was one of the few and carefully delineated exceptions to the warrant requirement. <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 749 (1984). Officer Cox was not sent to make an inquiry at the front door, and he never approached the front door. Acting on a reasonable suspicion, he drove onto the curtilage "to investigate the scene further." The plan the sergeant devised involved Officer Cox entering the curtilage "to establish probable cause" to charge the occupants with a crime. Officer Cox's conduct was consistent with that plan.

> The distinction between approaching a house to knock on the front
> door, as citizens do every day, and persisting . . . in a
> comprehensive search for . . . underage drinkers . . . would seem
> obvious. . . . [G]eneral searches of the curtilage of a private home
> may [not] be conducted without a warrant or exigent
> circumstances, based simply upon reasonable suspicion.

<u>Rogers</u>, 249 F.3d at 289.

For these reasons, and for the reasons more fully discussed in Judge Elder's dissent to the majority opinion and Judge Annunziata's dissent to the panel's opinion, <u>see</u> <u>Robinson v. Commonwealth</u>, 45 Va. App. 592, 622-32, 612 S.E.2d 751, 765-71 (2005), I would hold that the police officers' entry and search was violative of the Fourth Amendment.

Tuesday                    21st

June, 2005.


George Fisher Robinson,                                                    Appellant,

 against            Record No. 2539-03-2
                    Circuit Court Nos. 16,314, 16,317 through 16,321, 16,323,
                                16,328 and 16,329

Commonwealth of Virginia,                                               Appellee.


From the Circuit Court of Albemarle County

Before Chief Judge Fitzpatrick, Judges Benton, Elder, Bumgardner, Frank,
Humphreys, Clements, Felton, Kelsey, McClanahan and Haley


On May 31, 2005 came the appellant, by counsel, and filed a petition praying that the Court set aside the judgment rendered herein on May 17, 2005, and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered herein on May 17, 2005 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter.  It is further ordered that the appellant shall file with the clerk of this Court twelve additional copies of the appendix previously filed in this case.


A Copy,
                    Teste:
                                Cynthia L. McCoy, Clerk

         By:
                                Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, Felton and Senior Judge Annunziata[*]
Argued at Alexandria, Virginia


ELISA KENTY ROBINSON

v.      Record No. 2474-03-2

COMMONWEALTH OF VIRGINIA                          OPINION  BY
                                                 JUDGE ROBERT J. HUMPHREYS
GEORGE FISHER ROBINSON                            MAY 17, 2005

v.      Record No. 2539-03-2

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
                         Paul M. Peatross, Jr., Judge

        Francis McQ. Lawrence (Rhonda Quagliana; St. John, Bowling &
        Lawrence, LLP, on briefs), for appellant Elisa Kenty Robinson.

        Jonathan T. Wren (David Heilberg; Martin & Raynor, P.C.,
        on briefs), for appellant George Fisher Robinson.

        Donald E. Jeffrey III, Assistant Attorney General (Jerry W. Kilgore,
        Attorney General, on briefs), for appellee.


        George F. Robinson and Elisa K. Robinson (collectively, "the Robinsons") appeal their

convictions for contributing to the delinquency of a minor, a violation of Code § 18.2-371.  The

Robinsons argue on appeal that the trial court erred in denying their motions to suppress,

contending that, because the investigating police officer was located in the curtilage of their

home when he witnessed the illicit activity, the resulting search violated their Fourth

_____

        [*] Judge Annunziata participated in the hearing and decision of this case prior to the
effective date of her retirement on December 31, 2004 and thereafter by her designation as a
senior judge pursuant to Code § 17.1-401.

Amendment right to be free from unreasonable searches and seizures. For the following reasons, we disagree and affirm their convictions.

## I. BACKGROUND

In accord with our usual standard of review, on the appeal of a denial of a motion to suppress, we view the evidence and all reasonable inferences flowing from the evidence in a light most favorable to the Commonwealth, the party prevailing below. Garcia v. Commonwealth, 40 Va. App. 184, 189, 578 S.E.2d 97, 99 (2003); Sabo v. Commonwealth, 38 Va. App. 63, 69, 561 S.E.2d 761, 764 (2002).

On August 16, 2002, the Albemarle County Police Department received three separate telephone calls reporting an alleged underage drinking party at the Robinsons' home. Corporal Scott Cox was dispatched to investigate these allegations, and he arrived at the Robinsons' home at approximately 11:00 p.m. From the state road in front of the house, Cox could see ten to twenty cars parked on the state road, as well as two to three parked cars on the left-hand side of the driveway. From that position, Cox could also see the house, the front porch, the front door, and the front yard, although he could not see the backyard or the entire driveway. The floodlights above the front door were turned on, and the lights along the sidewalk leading to the front door were also turned on.

Cox, who was driving a marked police car with its headlights on, turned into the driveway and started to drive towards the house. While proceeding up the driveway, Cox saw several additional parked vehicles near the right side of the driveway, as well as "several parked vehicles near the side of the house" straight in front of him.

Cox continued up the driveway in his police car. From his position inside the police car, he began to see some "activity" in the backyard. Before reaching the point where the walkway to the front door intersects with the Robinsons' driveway, Cox saw two individuals holding clear

beer bottles. The individuals, both of whom appeared to be underage, were standing by a pine tree about seven or eight yards away from Cox's police car. The two juveniles "looked at [Cox], looked at the house, yelled 'cops,' dropped the beer bottles, and ran down a fence line toward the woods." Cox pulled his police car behind one of the parked cars and looked to his left. From that vantage point, "[h]e saw juveniles running toward the woods." Also, "[h]e could see a patio table covered with beer bottles and noticed beer bottles strewn about the backyard." Cox then got out of his car, "yelled for people to stop running, and radioed other officers who were waiting off the property that kids were running east into the woods."

The Robinsons were arrested and charged with nineteen counts of contributing to the delinquency of a minor. Both parties filed a motion to suppress, contending that Cox was unlawfully present on their property when he viewed the illicit activity.

At the suppression hearing, several photographs were introduced depicting the layout of the Robinsons' premises. According to the photographs, the driveway originates from the state road in front of the house. The driveway then splits into two paths. Both paths continue towards the house, and they both bend towards the right. The two branches of the driveway merge back into a single driveway near the front, right-hand corner of the house. The house is positioned entirely to the left of the driveway.

Also, a lighted sidewalk leads from the driveway to the front door of the Robinsons' home. This sidewalk intersects with the driveway just past the area where the two branches of the driveway reunite. A large bush has been planted in front of the sidewalk at the point where the sidewalk intersects with the driveway, shielding a portion of the sidewalk from view. Other than walking across the grass in the front yard, the driveway and connecting sidewalk serve as the only means of apparent pedestrian access to the front door of the house.

Where the driveway paths are divergent, the area between the two branches forms an "island" containing numerous trees. These trees, along with the general rightward bend of the driveway, shield the garage, backyard, and a large portion of the driveway from public view. The portion of the driveway shielded from public view includes the bush and the area where the front sidewalk intersects with the driveway.

At the suppression hearing, Cox testified that his police car was next to the bush in the driveway when he "clearly" saw "two male juveniles standing on the other side of the tree holding beer bottles." To clarify the position in the driveway from which the officer observed the juveniles, the trial court asked Cox, "So you were at the bush when you saw the two individuals?" Cox responded, "That's right."

Cox was asked repeatedly on cross-examination whether he entered the driveway for the purpose of knocking on the front door to speak with an occupant of the house. Each time Cox was asked the question, he responded that he entered the property to "investigate." Cox further responded in the affirmative to the following question: "Isn't it correct that you have described the situation you were hoping to observe as the effect when you flick on a light in a dark kitchen, and the cockroaches scatter?" Cox was also asked, "So you were looking for a reaction of people scattering to confirm your suspicion that you had an underage drinking party?" Cox responded, "Right."

By letter opinion dated August 4, 2003, the trial court denied the Robinsons' motions to suppress. In its written opinion, the trial court observed that Cox "planned to enter the property to investigate the allegations of underage consumption of alcohol." The trial court also observed that, "[a]s Cox went down the driveway, he could not see the backyard or the garage," but that "[h]e could see the house, the front yard, and the front porch." Additionally, the trial court found

that "[t]here were no signs posted"—such as a "no trespassing" sign—at the entrance to the driveway.

Based on this evidence, the trial court found that the Robinsons' driveway was not part of the curtilage of the house and, therefore, concluded that "Cox's presence there [did] not implicate the Fourth Amendment." The court additionally found that Cox's presence in the Robinsons' driveway was justified by the officer's right to conduct a "knock and talk," that is, to approach a home and knock on the front door to speak with an occupant. Under either of the preceding rationales, the trial court concluded that "Cox was in a lawful place in the driveway" when he observed the two juveniles drinking beer, and his observations were therefore admissible pursuant to the plain view exception to the warrant requirement. Accordingly, the trial court denied the Robinsons' motions to suppress.

The Robinsons were subsequently convicted of nine counts of contributing to the delinquency of a minor, and the trial court sentenced each defendant to six months in jail, three months suspended, on each count. The trial court ordered the sentences to run consecutively, resulting in active jail time of twenty-seven months for each defendant. The Robinsons appeal.

II. ANALYSIS

Although "'[w]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them,' . . . we review *de novo* the trial court's application of legal standards . . . to the particular facts of the case." McCracken v. Commonwealth, 39 Va. App. 254, 258, 572 S.E.2d 493, 495 (2002) (*en banc*) (quoting McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*)) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). Further, "[i]n reviewing a trial court's denial of a motion to suppress, 'the burden is upon [the appellant] to show that the ruling . . . constituted reversible error.'"

McGee, 25 Va. App. at 197, 487 S.E.2d at 261 (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).

Whether a defendant has a reasonable expectation of privacy in the item seized or the place searched is a mixed question of law and fact. That is, we are bound by the trial court's underlying findings of fact, but we review *de novo* the ultimate determination of whether the Fourth Amendment applies under the circumstances of this case. See Sharpe v. Commonwealth, 44 Va. App. 448, 454, 605 S.E.2d 346, 349 (2004) ("[W]e review *de novo* the trial court's application of defined legal standards such as whether a defendant had a reasonable expectation of privacy sufficient to permit him to raise a Fourth Amendment challenge to a search.").

A. Cox Was On the Curtilage When He Observed the Juveniles Drinking Beer

The Robinsons contend that Cox conducted an unconstitutional search because the place from which Cox observed the juveniles drinking beer was a part of the curtilage of their home. Although we agree that Cox observed the juveniles drinking beer from within the curtilage of the Robinsons' home and the trial court erred in concluding otherwise, that determination will not end our inquiry. See Part II.B, infra.

Because homeowners possess a reasonable expectation of privacy in the curtilage surrounding their homes, Oliver v. United States, 466 U.S. 170, 180 (1984), "the curtilage . . . warrants the Fourth Amendment protections that attach to the home." Id.; see also Jefferson v. Commonwealth, 27 Va. App. 1, 15, 497 S.E.2d 474, 481 (1998) ("Consistent with the common law understanding of the extent of the 'home,' the Supreme Court has held that the Fourth Amendment protections that apply to the house also apply to the 'curtilage' of the house."). Because the Fourth Amendment protects the curtilage to the same extent as the home, a police officer may not enter the curtilage without a warrant, exigent circumstances, or pursuant to an express or implied invitation from the occupant. See Payton v. New York, 445 U.S. 573,

589-90 (1980) ("To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances . . . ." (internal quotations omitted)).

Generally, the curtilage of a home is the "area around the home to which the activity of home life extends." Oliver, 466 U.S. at 180; see also Wellford v. Commonwealth, 227 Va. 297, 301, 315 S.E.2d 235, 238 (1984) (defining "curtilage" as the "space necessary and convenient, habitually used for family purposes and the carrying on of domestic employment; the yard, garden or field which is near to and used in connection with the dwelling"). "[W]hether a particular place is within the curtilage of the home is determined on a case-by-case basis." Jefferson, 27 Va. App. at 16, 497 S.E.2d at 481 (citing United States v. Dunn, 480 U.S. 294, 301 n.4 (1987)). In determining whether the area in question constitutes curtilage, "particular reference" to the following four factors is helpful:

> [1] the proximity of the area claimed to be curtilage to the home,
> [2] whether the area is included within an enclosure surrounding
> the home, [3] the nature of the uses to which the area is put, and
> [4] the steps taken by the resident to protect the area from
> observation by people passing by.

Dunn, 480 U.S. at 301; Jefferson, 27 Va. App. at 16, 497 S.E.2d at 481. "[T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 301.

Applying the Dunn factors to this case, we conclude that the portion of the driveway from which Cox observed the juveniles drinking beer—the area next to the bush—falls within the curtilage of the Robinsons' home. First, the area next to the bush is within a few feet of the

home itself. Second, the Robinsons testified that they used the area for washing cars and unloading groceries, home-related activities that evidence the "nature of the uses to which the area is put." See id. Third, although the area next to the bush is not "included within an enclosure surrounding the home," see id., the area is protected from public observation. Specifically, although the Robinsons did not erect a fence or post any no-trespassing signs, the trees and layout of the driveway obscure the area from public view. It is evident, therefore, that the area next to the bush is "protect[ed] . . . from observation by people passing by." Id. Given that three out of the four Dunn factors are satisfied, we are compelled to conclude that the area next to the bush is "intimately tied to the home itself" and, thus, falls within the curtilage of the Robinsons' home. See Jefferson, 27 Va. App. at 17, 497 S.E.2d at 482 (finding that place of defendant's arrest constituted curtilage because "the proximity of the place where Officer Harpster arrested appellant *was extremely close* to appellant's house and *could not be viewed by pedestrians and drivers passing in front of the house*" (emphasis added)); see also United States v. Jenkins, 124 F.3d 768, 773 (6th Cir. 1997) (finding that defendant's backyard is curtilage because it was "well shielded from the view of people passing by on the only public thoroughfare near defendant's property").

Accordingly, we conclude that the trial court erred in holding that the area of the driveway next to the bush was not a part of the curtilage of the house. However, in light of our holding that the Robinsons did not have a reasonable expectation of privacy in their driveway, see Part II.B, infra, this error is harmless. See Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 912 (1991) (*en banc*) (noting that an error is harmless "if a reviewing court can conclude, without usurping the . . . fact finding function, that, had the error not occurred, the [result] would have been the same").

B.  Whether the Robinsons Had A Reasonable Expectation of Privacy in the Area
of the Driveway by the Front Sidewalk

Although Cox was positioned within the curtilage when he made his observations, that determination does not end our inquiry.  It is well established that "'[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection,'" California v. Ciraolo, 476 U.S. 207, 213 (1986) (quoting Katz v. United States, 389 U.S. 347, 351 (1967)), because there is no reasonable expectation of privacy in items or places that are open to public observation.  See California v. Greenwood, 486 U.S. 35, 41 (1988).  The question we must answer, therefore, is whether the Robinsons knowingly exposed to the public the area of their driveway next to the bush, the place from which Cox viewed the criminal activity.[1]

The Commonwealth argues that the Robinsons knowingly exposed to the public the area by the front sidewalk because:  (1) the Robinsons' driveway is viewable from the state road, and (2) visitors exercising an implied invitation to the Robinsons' home would use that area to access the house and front door.  Although we disagree with the former contention, we conclude that, under the circumstances of this case, the Robinsons impliedly invited members of the public onto their driveway on the night in question.  Accordingly, because the Robinsons relinquished any reasonable expectation of privacy in this portion of their driveway, the Fourth Amendment does not apply to that area of the curtilage, and we therefore affirm the trial court's denial of the motions to suppress.

---

[1] We agree with the Commonwealth that observation of the curtilage is not prohibited when the police conduct observations from a public vantage point.  See generally Florida v. Riley, 488 U.S. 445 (1989) (approving observation of the curtilage from a helicopter); Ciraolo, 476 U.S. 207 (approving observation of the curtilage from an airplane); Jenkins, 124 F.3d 768 (approving observation of the curtilage from a helicopter).  Here, however, the police did not observe the curtilage from a public vantage point, such as public airspace or a public roadway; rather, the police entered the curtilage and from that private vantage point observed criminal activity.

1.  <u>Whether the Driveway is Visible From the Public Road</u>

The Commonwealth argues that the Robinsons have no reasonable expectation of privacy in their driveway because a segment of the driveway is visible from the state road. We disagree with this contention. We note that each of the cases relied upon by the Commonwealth is distinguishable because, in those cases, the driveway was viewable in its *entirety* from a public thoroughfare. See <u>Shaver v. Commonwealth</u>, 30 Va. App. 789, 793, 797, 520 S.E.2d 393, 395, 397 (1999) (upholding the police search of an ATV parked in defendant's driveway because the ATV was "visible from the road" and because "defendants made no attempt to restrict or shield the driveway from public view"); <u>see also</u> <u>United States v. Roccio</u>, 981 F.2d 587, 591 (1st Cir. 1992) (finding no reasonable expectation of privacy in car and driveway where the car "was clearly visible from the street on an unobstructed driveway"); <u>Maisano v. Welcher</u>, 940 F.2d 499, 503 (9th Cir. 1991) ("'The expectation of privacy which a possessor of land may reasonably have while carrying on activities on his driveway will generally depend upon the nature of the activities and *the degree of visibility from the street*.'" (emphasis added) (quoting <u>United States v. Magana</u>, 512 F.2d 1169, 1171 (9th Cir. 1975))); <u>United States v. Smith</u>, 783 F.2d 648, 650 (6th Cir. 1986) (finding no reasonable expectation of privacy in defendant's driveway where "there were no obstructions between the [public] road and the house"); <u>United States v. Humphries</u>, 636 F.2d 1172, 1179 (9th Cir. 1980) (finding police entry into driveway to view a vehicle license plate violated no reasonable expectation of privacy where "the auto was visible from the street" and where "the driveway was [not] enclosed by a fence, shrubbery or other barrier"); <u>cf.</u> <u>State v. Kelly</u>, 119 S.W.3d 587, 593-94 (Mo. Ct. App. 2003) (finding no reasonable expectation of privacy in the area around stairs leading to a front porch because "the area was not enclosed or protected from observation by passersby in any way and was entirely visible from the public street").

- 10 -

Here, only a portion of the driveway was viewable from the state road, and the area in the driveway from which Cox conducted his observations was shielded from public view by the trees and the bend of the driveway. Indeed, the trial court specifically found that Cox could not see the backyard or the garage due to the trees located between the branches of the driveway, and it is evident that he could not see the two juveniles drinking beer until he reached the area next to the bush, which, as discussed above, was not viewable from the state road. Because the area from which Cox observed the criminal activity was not viewable to members of the public traveling on the state road, the Robinsons legitimately retained a reasonable expectation of privacy in that area of the driveway unless they extended to the public an express or implied invitation to enter the property. See State v. Carter, 636 P.2d 460, 462 (Or. Ct. App. 1981) (finding that defendant had reasonable expectation of privacy in a portion of his property beyond an inner gate because that area was not viewable from beyond an outer metal gate).

## 2. Implied Invitation

The Commonwealth also argues that the Robinsons had no reasonable expectation of privacy in the area by the front sidewalk because, on the night of the party, the Robinsons extended an implied invitation to anyone, including a police officer, to approach the front door and knock. The Commonwealth's argument is that, in approaching the front door, a visitor would necessarily have to enter and walk up the driveway and then cross the area next to the bush in order to access the walkway to the front door. Because the Robinsons should expect visitors, including a police officer, to enter the same area that Cox entered, the Commonwealth reasons that the Robinsons knowingly exposed that area to the public. The Commonwealth concludes that the Robinsons therefore cannot have a reasonable expectation of privacy in that particular area and, as a result, Cox's presence in that area did not offend the Fourth Amendment.

- 11 -

Considering the totality of the circumstances of this case, we agree with the Commonwealth and conclude that the Robinsons extended an implied invitation to the public—including law enforcement officers—to use their driveway and front sidewalk when attempting to contact the owners or occupants of the property. We also conclude that, taking, as we must, the historical facts in the light most favorable to the Commonwealth, Cox's conduct did not fall outside the scope of this implied invitation.

a. <u>Whether the Robinsons Extended an Implied Invitation to Enter the Premises</u>

It is generally recognized that, unless they affirmatively warn or discourage trespassers, owners or possessors of private property implicitly invite the public to intrude upon certain, limited areas of their property. As we have noted,

> "People commonly have different expectations, whether considered or not, for the access areas of their premises than they do for more secluded areas. Thus, we do not place things of a private nature on our front porches that we may very well entrust to the seclusion of a backyard, patio or deck. In the course of urban life, we have come to expect various members of the public to enter upon such a driveway, e.g., brush salesmen, newspaper boys, postmen, Girl Scout cookie sellers, distressed motorists, neighbors, friends. Any one of them may be reasonably expected to report observations of criminal activity to the police."

<u>Shaver</u>, 30 Va. App. at 796, 520 S.E.2d at 397 (quoting <u>State v. Corbett</u>, 516 P.2d 487, 490 (Or. Ct. App. 1973)).

This invitation, where it exists, extends only to those areas of the property that would be used when approaching the residence in an ordinary attempt to speak with the occupants. <u>See</u> <u>id.</u> Thus, areas of the curtilage that must be crossed in order to approach the front door—for example, the driveway, front sidewalk, and front porch—are generally exempted from Fourth Amendment protection. <u>See, e.g.</u>, <u>State v. Clark</u>, 859 P.2d 344, 349 (Idaho Ct. App. 1993) ("There is an implied invitation for the public to use access routes to the house, such as parking areas, driveways, sidewalks, or pathways to the entry, and there can be no reasonable expectation

- 12 -

of privacy as to observations which can be made from such areas."). As a result, if the property owner has implicitly invited the public to use a particular "path" when attempting to access his home, he has no reasonable expectation of privacy in that area. See id.

By extension, the same implied invitation is given to police officers who enter the curtilage while in pursuit of legitimate police business. See Shaver, 30 Va. App. at 796, 520 S.E.2d at 397 ("'If one has a reasonable expectation that various members of society may enter the property in their personal or business pursuits, he should find it equally likely that the police will do so.'" (quoting Corbett, 516 P.2d at 490)); see also State v. Cada, 923 P.2d 469, 477 (Idaho Ct. App. 1996) ("[T]he direct access routes to the house, including parking areas, driveways and pathways to the entry, are areas to which the public is impliedly invited, and [] police officers restricting their activity to such areas are permitted the same intrusion and the same level of observation as would be expected from a 'reasonably respectful citizen.'").[2] Accordingly, "[w]hen police enter onto private property in order to conduct an investigation or for another legitimate purpose and restrict their entry to places that other visitors would be expected to go, such as walkways, driveways, or porches, any observation made from these areas is permissible under the Fourth Amendment." Trimble v. State, 816 N.E.2d 83, 88 (Ind. Ct. App. 2004); see also State v. Maxfield, 886 P.2d 123, 134 (Wash. 1994) ("If a law enforcement officer or agent does not go beyond the area of the residence that is impliedly open to the public, such as the driveway, the walkway, or an access route leading to the residence, no privacy interest is invaded.").

An implied invitation is generally presumed to exist absent evidence of an affirmative intent to exclude the public from the premises. See, e.g., People v. Kozlowski, 505 N.E.2d 611,

---

[2] See generally 1 Wayne R. LaFave, Search and Seizure § 2.3(f), at 600-03 (4th ed. 2004).

- 13 -

612 (N.Y. 1987) ("Absent evidence of intent to exclude the public, the entryway to a person's house offers implied permission to approach and knock on the front door."); State v. Somfleth, 8 P.3d 221, 227 (Or. Ct. App. 2000) ("A homeowner can abrogate the presumption of implied consent to approach the front door by undertaking sufficient steps to exclude casual visitors from the front yard."). Here, then, we must consider whether, under the totality of the circumstances, the Robinsons affirmatively intended to exclude members of the public from their premises. See generally State v. Wyatt, 961 P.2d 653, 656 (Idaho Ct. App. 1998) ("The determination whether a particular citizen had a legitimate expectation of privacy depends upon the unique facts of each case. We therefore examine the citizen's efforts to protect his own privacy from observation by the general public, taking into account norms of social conduct and the nature of the premises.").

Factors that may be particularly relevant to this determination include, *inter alia*: (1) whether the homeowner has erected any physical barriers, such as gates or fences, across the entrance to the property, and (2) whether the homeowner has posted signs, such as "no trespassing" or "private property" signs, indicating a desire to exclude the public from the premises. See, e.g., State v. Christensen, 953 P.2d 583 (Idaho 1998) (no implied invitation to enter where the entrance to the driveway was obstructed by a closed gate posted with a "no trespassing" sign); State v. Pacheo, 101 S.W.3d 913, 919 (Mo. Ct. App. 2003); State v. McIntyre, 860 P.2d 299, 301 (Or. Ct. App. 1993) ("[C]ourts must consider all surrounding circumstances, including the existence of a fence, to determine the residents' intent."); State v. Ridgway, 790 P.2d 1263, 1265 (Wash. Ct. App. 1990) (holding that marijuana recovered from doorstep should have been suppressed because police observed the marijuana after walking around a closed gate and evading guard dogs while approaching house).

Here, the Robinsons did not erect any physical barriers barring entry onto their property. There were no gates, fences, wires, or highway cones indicating that members of the public were

- 14 -

not welcome to use the Robinsons' driveway and front sidewalk in an effort to speak with the occupants of the premises. Nor did they post any signs indicating that the general public was not welcome to enter upon their property to approach their front door. Considering the totality of the circumstances, we conclude that the Robinsons extended to the public an implied invitation to enter the driveway and front sidewalk of their premises.

### b. Whether Cox Exceeded the Scope of the Implied Invitation

Although we hold that the Robinsons extended an implied invitation to the public to enter their property and approach the front door, we must also consider whether Cox's conduct on the night of the party exceeded the scope of that implied invitation. Ultimately, whether the officer exceeded the scope of the implied invitation "cannot be determined by a fixed formula," but must instead "be based on the facts and circumstances of each case." People v. Thompson, 270 Cal. Rptr. 863, 874 (Ct. App. 1990).[3]

"[U]nder normal circumstances, uninvited visitors coming to a residence to speak with an owner or resident are expected to come to the residence's most direct, obvious, and prominent entryway, which in most cases is the front door." Trimble, 816 N.E.2d at 88. These visitors "are also expected to leave by the same route after knocking on the front door and receiving no response," unless the "nature of the circumstances surrounding the visit" indicates that the visitor "could reasonably be expected to seek out residents through areas other than the front door." Id. Generally, "a substantial and unreasonable departure from the normal access route will exceed the scope of the implied invitation and intrude upon a constitutionally protected privacy interest." Clark, 859 P.2d at 350.

---

[3] Relevant factors that have been identified include "whether the officer (1) spied into the house; (2) acted secretly; (3) approached the house in daylight; (4) used the normal, most direct route to the house; (5) attempted to talk with the resident; (6) created an artificial vantage point; and (7) made the discovery accidentally." State v. Ross, 959 P.2d 1188, 1190 (Wash. Ct. App. 1998).

Also, an implied invitation to approach the front door of a private residence is limited in scope to those persons who are on the property for a "legitimate social or business purpose." State v. Cloutier, 544 A.2d 1277, 1280 (Me. 1988).  In the context of law enforcement officers, officers who are located on the curtilage for the purpose of approaching the front door and questioning the residents of the house are deemed to be pursuing a "legitimate purpose."  See, e.g., Shaver, 30 Va. App. at 793, 794, 520 S.E.2d at 395, 396 (noting that "investigators intended to speak with the defendants" and that the investigators first "knocked on the front door of the residence but no one answered").[4]

Although the implied invitation does permit officers to seek out the occupants of a residence in order to "investigate," the scope of this invitation does not encompass the right to conduct a general search of the premises.  See, e.g., United States v. Bradshaw, 490 F.2d 1097, 1100 (4th Cir. 1974) (noting that the officer must have a legitimate purpose other than conducting "a search of such premises directed against the accused"); see also Rogers v. Pendleton, 249 F.3d 279, 288 (4th Cir. 2001); Alvarez v. Montgomery County, 147 F.3d 354, 358 (4th Cir. 1998).  As noted by the Fourth Circuit,

> the right to "knock and talk," that is, to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants, [is] not the right to make a general investigation in the curtilage based on reasonable suspicion.  A contrary rule would eviscerate the principle of Oliver and Dunn that the curtilage is entitled to the same level of Fourth Amendment protection as the home itself.

---

[4] See also United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir. 2001) ("Law enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants."); United States v. James, 40 F.3d 850, 862 (7th Cir. 1994) (finding that police did not violate the Fourth Amendment where they used a walkway, which was part of the curtilage of the home, "[i]n their attempt to reach the lower floor residents"); United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990) (noting that a "policeman may lawfully go to a person's home to interview him").

Rogers, 249 F.3d at 289.  A police officer exceeds the legitimate scope of an implied invitation if he seeks to "convert[] this limited license to do what any citizen may do—approach the house and speak to the inhabitant or owner—into a license to search for 'evidence.'"  Id. at 294.  Thus, if a law enforcement officer, in an attempt to uncover illicit activity, strays from the "path" that is impliedly open to the public, he has exceeded the scope of the implied invitation and, as a result, violated the Fourth Amendment.

Similarly, entering the property late at night, especially if accompanied by the use of subterfuge, may exceed the scope of the implied invitation.  As noted by one court,

> Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors.  Indeed, if observed by a resident of the premises, it could be a cause for great alarm.  As compared to open daytime approaches, surreptitious searches under the cover of darkness create a greater risk of armed response—with potentially tragic results—from fearful residents who may mistake the police officers for criminal intruders.

Cada, 923 P.2d at 478; see also Griffin v. State, 67 S.W.3d 582, 587 (Ark. 2002) ("'[T]here is no rule of private or public conduct which makes it illegal *per se*, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at *high noon*, to walk up the steps and knock on the front door of any man's castle with the honest intent of asking questions of the occupant thereof whether the questioner be a pollster, a salesman, or an officer of the law.'" (internal quotations omitted) (emphasis added) (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964))); Brown v. State, 392 So. 2d 280, 284 (Fla. Dist. Ct. App. 1980) (finding that police violated defendant's reasonable expectation of privacy when they entered defendant's driveway without a warrant at 1:45 a.m. and arrested him); Cloutier, 544 A.2d at 1280 (noting that "the implied invitation extends only to recognized access routes . . . and to *reasonable times of day*" (emphasis added)); State v. Myers, 815 P.2d 761, 769 (Wash. 1991) (noting that whether

- 17 -

a police officer enters a premises during the daylight hours is relevant in determining whether the scope of an implied invitation to enter premises has been exceeded).

Also, although law enforcement officers who "enter areas of the curtilage which are impliedly open" to the public are "free to keep their eyes open," State v. Seagull, 632 P.2d 44, 47 (Wash. 1981), an officer who implements an overly intrusive means of investigation, such as the use of binoculars or other sensory-enhancing devices, may exceed the scope of the implied invitation. See Cada, 923 P.2d at 477 ("The scope of the implied invitation to enter areas of the curtilage that provide direct access to the house . . . may be exceeded where officers employ a particularly intrusive method of viewing."); Cloutier, 544 A.2d at 1280 (holding that the defendant had no reasonable expectation of privacy in a marijuana plant where, *inter alia*, the officer "detected the contraband by means of his natural senses"). But cf. State v. Lee, 633 P.2d 48, 51 (Utah 1981) ("[T]he use of a flashlight to assist the natural vision at night does not make an 'observation' a 'search.'").

Here, considering the totality of the circumstances, we conclude that Cox did not exceed the scope of the implied invitation to enter the premises and approach the front door of the Robinsons' home. Cox entered the driveway, began to drive toward the residence, and, *before* he reached the area of the driveway where the front walk intersects with the driveway, he saw the minors drinking in the Robinsons' backyard. At that point, Cox had gone no further than any member of the public would have gone in an attempt to contact the owners of the property. He did not stray from the "path" leading directly from the road to the front door (i.e., the driveway and the front sidewalk), nor did he attempt to conduct a general search of the premises through use of an overly intrusive means of investigation.

Also, although Cox entered the curtilage of the Robinsons' home at 11:00 p.m., a late hour of the evening, this entry did not necessarily exceed the scope of the implied invitation.

- 18 -

"Under some circumstances, the mere fact that the intrusion was made late at night may be a factor suggesting that the police conduct was unduly intrusive." State v. Morris, 961 P.2d 653, 657 n.3 (Idaho Ct. App. 1998). Here, however, the lights along the Robinsons' front sidewalk and the lights on the front porch were still turned on. Also, multiple cars were parked along the driveway and on the public road in front of the house. These factors give rise to a reasonable inference that the implied invitation to approach the front door of the residence had not yet been rescinded for the night.[5] Also, we note that Cox drove up the driveway with his headlights turned on—the same way that any member of the general public would presumably have approached the house—rather than using subterfuge or the "cover of darkness" in an attempt to disguise his approach. Compare Cada, 923 P.2d at 478 (officers exceeded scope of implied invitation where they engaged in a "clandestine intrusion . . . under cover of darkness in the dead of night"), with Clark, 859 P.2d at 346 (officers did not exceed scope of implied invitation where the officers went to the front door of the residence at 10:00 p.m. to investigate a neighbor's complaint about a loud party).[6] Considering the totality of the circumstances, we conclude that, on the night in question, the implied invitation to enter the Robinsons' premises was still open

---

[5] This inference is supported by the fact that various members of the public had, in fact, approached the residence and "crashed" the party on the night in question.

[6] See also Morris, 961 P.2d at 657 n.3 (noting that the "late hour" was "not such a factor in this case," reasoning that "[i]f the investigation had been delayed until the next day, the [subject of the investigation] might have been gone"); Ross, 959 P.2d at 1191 (finding that the officers exceeded the scope of an implied invitation where "the officers arrived in an unmarked car, in plain clothes, after midnight, and made no attempt to contact [the defendant] or otherwise notify him of their presence").

- 19 -

even at this late hour, and Cox did not exceed the scope of this implied invitation when he drove up the Robinsons' driveway.

Moreover, Cox entered the curtilage of the Robinsons' home with the purpose of investigating reports of underage drinking at the residence. "[T]he investigation of an anonymous tip is clearly legitimate police activity so long as the investigation does not violate applicable constitutional provisions." Divello v. State, 782 N.E.2d 433, 437-38 (Ind. Ct. App. 2003). Because Cox entered the premises to "investigate," he had a legitimate purpose for being present on the Robinsons' driveway at the time he viewed the illicit activity.

Also, we do not accept the Robinsons' argument that Cox's subjective intent indicates that the entry exceeded the scope of the implied invitation. Generally, the determination of whether a Fourth Amendment violation has occurred is based on "'an objective assessment of the officer's actions . . . and not on the officer's state of mind at the time the challenged action was taken.'" Limonja v. Commonwealth, 8 Va. App. 532, 538, 383 S.E.2d 476, 480 (1989) (*en banc*) (quoting Maryland v. Macon, 472 U.S. 463, 470-71 (1985)). Although cases from other jurisdictions have inquired into the officer's subjective intent, we note that, in each of those cases, the officer's intent only became relevant if the officer exceeded the ordinary scope of the implied invitation by, for example, invading other areas of the curtilage *after* attempting a "knock and talk." See, e.g., Estate of Smith v. Marasco, 318 F.3d 497, 520-21 (3d. Cir. 2003) (remanding qualified immunity case for further factual determinations where the officers knocked on the front door, the defendant failed to answer, and the officers then entered the backyard of the residence); Alvarez, 147 F.3d at 357 (inquiring into officer's subjective purpose for entering the backyard where the officers, who were investigating an underage drinking party, approached the front door, noticed a sign that said "Party in Back," and then went to the backyard to "speak with the party's host").

Without expressly adopting or rejecting the rationale of these cases, we note that they are distinguishable because, here, Cox had not yet performed a "knock and talk," nor had he invaded any area of the curtilage beyond the "path" to the front door. Rather, when Cox viewed the illicit activity, he had not yet finished driving up the driveway. Under the circumstances of this case, then, there is no additional intrusion into the curtilage that would necessitate an inquiry into Cox's subjective intent. Cf. McIntyre, 860 P.2d at 302 (holding that "[t]he trial court's reliance on the officers' investigative purpose was misplaced" because "'[c]riminal investigation is as legitimate a societal purpose as is census taking or mail delivery'" (quoting Corbett, 516 P.2d at 490) (second alteration in original)).

Considering the totality of the circumstances, we therefore conclude that the Robinsons extended an implied invitation to the public to enter their driveway on the night of the party. We further conclude that, when Cox entered the curtilage with the purpose of "investigating" the allegations of underage drinking, he did not exceed the scope of this implied invitation because, at the point in time when he viewed the illicit activity, he had gone no further than an ordinary member of the public would have gone in an attempt to contact the occupants of the property. Accordingly, because the Robinsons extended an implied invitation to enter the property, and because Cox did not exceed the scope of that invitation, the Robinsons had no reasonable expectation of privacy in the area of the driveway by the bush, and Cox's actions neither implicated nor violated the Fourth Amendment.

C. Because the Fourth Amendment Does Not Apply, The Evidence Is Admissible

The Robinsons submit that the trial court erred in its legal conclusion that Cox's observations were admissible pursuant to the plain view exception to the warrant requirement.[7]

---

[7] In order for a search to come within the plain view exception, two requirements must be met: "(a) the officer must be lawfully in a position to view and seize the item, [and] (b) it must be immediately apparent to the officer that the item is evidence of a crime, contraband, or

- 21 -

However, we need not reach the issue of whether the plain view *exception* applies because Cox's presence in the Robinsons' driveway did not implicate the Fourth Amendment. Rather, because the illicit conduct was clearly visible from an area in which the Robinsons had no reasonable expectation of privacy, the plain view *doctrine* applies, and the observations are admissible.

That is, because the Robinsons had extended an implied invitation to the public to use the driveway to access the front door of their home, they had no reasonable expectation of privacy in that area. See Clark, 859 P.2d at 349 ("There is an implied invitation for the public to use access routes to the house . . . and there can be no reasonable expectation of privacy as to observations which can be made from such areas."); Divello, 782 N.E.2d at 437 ("[A]n individual does not have a reasonable expectation of privacy with regard to things or activities within a residence that may be observed by persons using their natural senses from places impliedly open to a visitor's entry."). And, because the Robinsons had no reasonable expectation of privacy in the illicit activities that were clearly visible from their driveway, the Fourth Amendment does not apply to any observations made by a police officer who was present in the driveway and complying with the terms of that implied invitation. See Illinois v. Andreas, 463 U.S. 765, 771 (1983) ("If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause."); see also Clark, 859 P.2d at 348 ("[A] policeman's mere observation from a vantage point that does not infringe upon a privacy interest, of something open to public view, normally implicates no Fourth Amendment constraints because observation of items readily visible to the public is not a 'search.'"); State v. Harris, 919 S.W.2d 619, 624 (Tenn. Crim. App. 1995) ("What an officer sees from a vantage point along the walkway between the public road and the front door is not protected by [] the

otherwise subject to seizure." Hamlin v. Commonwealth, 33 Va. App. 494, 502, 534 S.E.2d 363, 367 (2000) (citations omitted), aff'd on reh'g en banc, 35 Va. App. 373, 545 S.E.2d 556 (2001).

- 22 -

Fourth Amendment . . . ."). Because the Fourth Amendment does not apply, no warrant is required and, therefore, no exception to the warrant requirement is needed. See generally Commonwealth v. Carelli, 546 A.2d 1185 (Pa. Super. Ct. 1988) ("Because there is no search, there is no need for an *exception* to permit admission of testimony relating to the observation." (emphasis in original)). Because Cox's observations do not implicate the Fourth Amendment, those observations are admissible in their entirety.

## III.  CONCLUSION

We hold that, under the facts of this case, the area of the driveway next to the bush is part of the curtilage of the Robinsons' home. We further hold, however, that the area was not protected by the Fourth Amendment because the Robinsons had no reasonable expectation of privacy in that area of the curtilage. Rather, because the Robinsons extended an implied invitation to members of the public to enter the portion of driveway before the walkway to the front door, Cox's presence on the driveway did not implicate the Fourth Amendment and, therefore, did not constitute an illegal search. Because Cox's observations did not implicate the Fourth Amendment, the trial court properly denied the Robinsons' motions to suppress. Accordingly, we affirm the convictions.

Affirmed.

Annunziata, J., dissenting.

I concur in the majority's finding that Officer Cox entered the curtilage of the Robinson residence and that he conducted the challenged search from that vantage point. I write separately, however, because I do not agree that the search can be found constitutionally proper on the theory that the Robinsons had impliedly invited Officer Cox's entry, thereby extinguishing any reasonable expectation of privacy they had in the curtilage. Cox's sole and undisputed purpose for entering the curtilage was to search for criminal activity. Consistent with the guarantees of the United States Constitution, it cannot be said that citizens impliedly extend an invitation to the police to enter their home or curtilage to conduct a search. On that ground, I would hold that Cox violated the Robinsons' rights under the Fourth Amendment.

"Curtilage" is defined as the "space necessary and convenient, habitually used for family purposes and the carrying on of domestic employment; the yard, garden or field which is near to and used in connection with the dwelling." Wellford v. Commonwealth, 227 Va. 297, 302, 315 S.E.2d 235, 238 (1984) (internal citations omitted).

> The doctrine of curtilage is grounded in the peculiarly strong concepts of intimacy, personal autonomy and privacy associated with the home. The home is fundamentally a sanctuary, where personal concepts of self and family are forged, where relationships are nurtured and where people normally feel free to express themselves in intimate ways. The potent individual privacy interests that inhere in living within a home expand into the areas that enclose the home as well. The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is not true simply in a mechanical sense because the areas are geographically proximate. It is true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house. Personal interactions, daily routines and intimate relationships revolve around the entire home place. There are compelling

reasons, then, for applying Fourth Amendment protection to the entire dwelling area.

Dow Chemical Co. v. United States, 749 F.2d 307, 314 (6th Cir. 1984), aff'd, 476 U.S. 227 (1986).

Determining what constitutes curtilage is rooted in the specific facts of each case. Jefferson v. Commonwealth, 27 Va. App. 1, 16, 497 S.E.2d 474, 481 (1998). In determining whether the area in question constitutes curtilage, "particular reference" to the following four factors is helpful:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987); see Jefferson, 27 Va. App. at 16, 497 S.E.2d at 481.

Although the area in question was not enclosed by gate or fence, I concur that the place in the Robinsons' driveway from which Cox gathered the challenged evidence was within the curtilage.[8] Cox was located in close proximity to the house and in an area hidden from public

---

[8] The testimonial and photographic evidence reveal that a large bush, when viewed from the street, stands immediately in front of the walkway to the front door that intersects the driveway. The bush and walkway are but a few feet in front of the garage. Cox testified repeatedly that he was next to this bush in the driveway when he first saw the juveniles on the other side of the tree. Closer scrutiny of Cox's testimony reveals that, after driving his vehicle into the driveway, he continued moving down the driveway up to and past the bush that shielded the garage doors and the sidewalk leading to the front door from public view. According to his testimony, Cox was continuing his investigation into the curtilage as the nature of his observations and their implications of criminal activity became clearer.

At one point in his testimony, the following exchange took place:

> Q: And as you proceeded up the driveway further and further, the first thing you saw was [sic] persons who appeared to you to be young.

view by an island of dense tree growth and a large bush just beyond.  See Dunn, 480 U.S. at 301;

cf. Shaver v. Commonwealth, 30 Va. App. 789, 797, 520 S.E.2d 393, 397 (1999) (holding that

A:  Yes, sir.

Q:  Strike that.  The first thing you saw was some activity.

A:  Correct.

Q:  And you kept moving.  You never stopped.

A:  That's correct.

Q:  The second thing you saw was a couple of people that appeared
to you to be underage; okay?

A:  Yes, sir.

Q:  And at or about the same time, you saw something in their - -
you saw long necked glass - - white glass bottles in their hand.

A:  Clear; yes, sir.

Q:  And then you were some distance - -

A:  Still, yes.

Q:  And you kept on going?

A:  Yes, sir.

Q:  And you kept on going because, although they appeared to be young and it
might have been beer, your experience told you that you wouldn't know for sure
until they ran when they saw you.

A:  Not necessarily; when they - - I didn't know what they were going to do.  I
wanted to identify them, to find out what their age was, and to see if it was
alcohol.

Q:  And you weren't able to do that from a distance.  But when they dropped
whatever it was, you could see the label; is that right?

A:  That's correct.

Q:  And they scattered.  And that, in your mind, was telling.

- 26 -

defendants had no reasonable expectation of privacy in an area that was not restricted from public view by means of a fence, shrubbery, or other barrier).  In addition, the area was used for unloading groceries and washing cars, activities that are home-related and that evidence the "nature of the uses to which the area is put."  Dunn, 480 U.S. at 301; see Vanessa Rownaghi, Driving Into Unreasonableness:  The Driveway, the Curtilage, and Reasonable Expectations of Privacy, 11 Am. U.J. Gender Soc. Pol'y & L. 1165, 1181-82 (2003) (explaining that in addition to application of the Dunn factors, the essential inquiry that remains in determining what areas deserve Fourth Amendment protection is "whether the area harbors 'intimate activity associated with the sanctity of a man's home and the privacies of life'" (quoting Boyd v. United States, 116 U.S. 616, 630 (1886))).

However, Cox's presence upon and search from the curtilage notwithstanding, the majority concludes that the Robinsons did not have a reasonable expectation of privacy in the area because Cox had an implied invitation to approach the house and talk to its occupants.[9]  I

---

A:  Yes, sir.

Q:  Before that, it was maybe.  After that, it was probable.

A:  Yes, sir.

This exchange demonstrates that Cox conducted a search into the driveway with his vehicle, continuing forward until he reached the bush that hides part of the driveway, the garage and the sidewalk to the front door, and proceeding until the alleged juveniles dropped the beer and scattered.  Such conduct goes beyond the implied invitation that any citizen has to enter the driveway and approach the front door.

[9] The majority reasons that the police had an implied invitation to approach the Robinsons' front door because, in order to gain access to the door, they, like any visitor, would have to enter the curtilage and cross the area from which Cox observed individuals he believed to be juveniles drinking beer.  Therefore, according to the majority, no Fourth Amendment violation occurred.

disagree, not with the general principle underlying the conclusion, but with its applicability here under these facts and circumstances.

In Shaver, we addressed the theory of implied invitation, stating that "'[i]n the course of urban life, we have come to expect various members of the public to enter upon such a driveway, e.g., brush salesmen, newspaper boys, postmen, Girl Scout cookie sellers, distressed motorists, neighbors, friends.'" 30 Va. App. at 796, 520 S.E.2d at 397 (quoting State v. Corbett, 516 P.2d 487, 490 (Or. Ct. App. 1973)). The implied invitation theory permitting entry into the curtilage of a home has been discussed and applied, either expressly or impliedly, in case law from several other jurisdictions. See, e.g., In re Gregory S., 169 Cal. Rptr. 540, 546 (Cal. Ct. App. 1980) (noting that resident has minimal, if any, expectation of privacy in area where public has been implicitly invited); State v. Cada, 923 P.2d 469, 477 (Idaho Ct. App. 1996) (noting that "the direct access routes to the house, including parking areas, driveways and pathways to the entry, are areas to which the public is impliedly invited, and that police officers restricting their activity to such areas are permitted the same intrusion and the same level of observation as would be expected from a 'reasonably respectful citizen'"); State v. Cloutier, 544 A.2d 1277, 1280 (Me. 1988) (noting that "the owner impliedly invites to intrude upon his or her property only those with a legitimate social or business purpose"); People v. Kozlowski, 505 N.E.2d 611, 612 (N.Y. 1987) (holding that, "[a]bsent evidence of intent to exclude the public, the entryway to a person's house offers implied permission to approach and knock on the front door"). Therefore, an officer of the law does not violate the Fourth Amendment if, in entering private property, the officer does nothing more than what a reasonably respectful citizen would do. See State v. Dyreson, 17 P.3d 668, 710 (Wash. Ct. App. 2001); Mei Fung So, Annotation, Search and Seizure: Reasonable Expectation of Privacy in Driveways, 60 A.L.R. 5th 1 § 2a (1998 and Supp. 2004).

It follows that, where the evidence establishes the police have entered the curtilage of a home without a warrant for the purpose of speaking to an occupant of the home, the entry is generally upheld.  See, e.g., Shaver, 30 Va. App. at 793-94, 520 S.E.2d at 395 (noting that "investigators intended to speak with the defendants"); Alvarez v. Montgomery County, 147 F.3d 354, 358 (4th Cir. 1998) (upholding officers' entry into the curtilage where they had a "'legitimate reason' for entering the Alvarezes' property 'unconnected with a search of such premises' (quoting United States v. Bradshaw, 490 F.2d 1097, 1100 (4th Cir.1974))); United States v. James, 40 F.3d 850, 862 (7th Cir. 1994) (finding that police did not violate the Fourth Amendment where they used a walkway, which was part of the curtilage of the home, "[i]n their attempt to reach the lower floor residents"); United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990) (finding that police did not violate the Fourth Amendment where they observed a firearm through a kitchen window while attempting to contact the defendant homeowner and holding that a "policeman may lawfully go to a person's home to interview him"); Kozlowski, 505 N.E.2d at 612 (noting that the "the officer walked up the driveway and onto an open-ended porch [and that h]e opened the screen door in order to knock on the front door"); see generally Griffin v. State, 67 S.W.3d 582, 587 (Ark. 2002) (stating that "'there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's castle with the honest intent of asking questions of the occupant thereof whether the questioner be a pollster, a salesman, or an officer of the law'" (some internal quotations omitted) (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964))).

That said, this case is manifestly not one that comes within the umbrella of implied invitation decisions.  Cox made no attempt whatsoever to approach or knock on the front door of

the Robinsons' home and speak to the occupants, nor did he testify to any such intent.[10]  Indeed, as discussed below, his testimony established that he was there to conduct a search.  Thus, the theory of implied invitation upon which the majority relies for its rationale remains just that:  a theoretical proposition of what Cox could have done, but not what he, in fact, did.  The judicial decisions that invoke the implied invitation exception to the Fourth Amendment's requirement that a search be conducted pursuant to a warrant do not turn on such an abstract or hypothetical application of principles, wholly unmoored from the facts of the case.  Absent an examination of the evidence showing the purpose underlying the police intrusion into constitutionally protected property, a court cannot determine whether the entry complied with constitutional mandates.  As noted in Rogers v. Pendleton, 249 F.3d 279, 289 (4th Cir. 2001), police officers have no right to enter upon curtilage to make an investigation based on reasonable suspicion. Instead, the right police officers have is

> the right to "knock and talk," that is, to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants, not the right to make a general investigation in the curtilage based on reasonable suspicion.  A contrary rule would eviscerate the principle of Oliver and Dunn that the curtilage is entitled to the same level of Fourth Amendment protection as the home itself.

---

[10] When asked repeatedly if he entered the Robinsons' driveway with the intent to speak to an occupant of the house, the following exchange ensued:

> Q:  Officer Cox, isn't it true that it was not your intent to walk to the front door and knock on it, as you proceeded up that driveway that night?
>
> A:  My intent when I drove up the driveway was to establish probable cause, to investigate the scene further.

Furthermore, the evidence establishes that, consistent with his intent to "investigate the scene," Cox drove directly up the driveway until he came to a point where he could observe what he expected to find:  juveniles in the act of drinking beer.  See discussion supra note 8.

Id.[11]  The Fourth Circuit underscored the same principle in Bradshaw, 490 F.2d at 1100, noting,

after considering all the evidence bearing on the question, that an incursion into the curtilage of a

rural home to speak to the occupants was lawful when "*unconnected with a search* of such

premises *directed against the accused*."  Id. at 1104 (emphasis added).[12]

These cases demonstrate the importance of distinguishing between a police officer's right

by implied invitation to "knock and talk," that is, to knock on a residence's door or otherwise

approach the residence by implied invitation seeking to speak to the inhabitants, and a police

officer's attempt to make a general investigation in the curtilage based on reasonable suspicion.

Failing to make the distinction, as the Rogers court warned, would unconstitutionally "convert[]

this limited license to do what any citizen may do—approach the house and speak to the

inhabitant or owner—into a license to search for 'evidence.'"  Rogers, 249 F.3d at 294.

An officer's purpose in entering the curtilage is thus a critical factor in determining

whether police intrusion on private property falls within the property owner's implied invitation

to the public.  See, e.g., id. at 289; Alvarez, 147 F.3d at 358; Bradshaw, 490 F.2d at 1100; see

also Estate of Smith v. Marasco, 318 F.3d 497, 520 (3d Cir. 2003) ("Where officers are pursuing

---

[11] In Rogers, the officer encountered the defendant homeowner in the front yard of his house.  249 F.3d at 284.  The officer testified that after speaking with the defendant, who asked him to leave, the officer wanted to speak with someone "who was sober."  Id.  The officer then informed the defendant that he intended to conduct a search of the premises.  Id.  The court found these facts sufficient to show that the officer's intention was to search for evidence rather than to contact another homeowner.  Id. at 287-90.  Thus, any intrusion into the curtilage violated the Fourth Amendment's protections.  Id.

[12] In Bradshaw, the court held that the officer subsequently exceeded the "legitimate reason" for his visit when, without legally sufficient justification, he searched a vehicle near the residence.  Id. at 1101.  The court found that the officer's intent to conduct a search was evidenced by the fact that while en route to the back door to speak with the occupant of the house, the officer strayed from his path to peer into the crack between the closed doors of a nearby parked vehicle.  Id.  This detour made clear that the officer's intent was no longer to seek to speak with the defendant.  Id.

a lawful objective, *unconnected to any search for the fruits and instrumentalities of criminal activity*, their entry into the curtilage after not receiving an answer at the front door might be reasonable as entry into the curtilage may provide the only practicable way of attempting to contact the resident . . . ." (emphasis added)); United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir. 2001) ("Law enforcement officers may encroach upon the curtilage of a home *for the purpose of asking questions of the occupants*." (emphasis added)); Daoust, 916 F.2d at 758 ("A policeman may lawfully go to a person's home *to interview him*." (emphasis added)); cf. Lo-Ji Sales v. New York, 442 U.S. 319, 329 (1979) (rejecting the state's argument that store owners had no legitimate expectation of privacy in the items for sale in their store because "there is no basis for the notion that, because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees"); see generally Lewis v. United States, 385 U.S. 206, 211 (1966) (explaining that undercover agents, "in the same manner as a private person, may accept an invitation to do business and may enter upon the premises *for the very purposes* contemplated by the occupant" but that when entry is gained by invitation "an agent is [not] authorized to conduct a general search for incriminating materials" (emphasis added)).

The majority dismisses the import of these cases on the ground that Fourth Amendment inquiries are typically based on "'an objective assessment of the officer's actions . . . and not on the officer's state of mind at the time the challenged action was taken.'" Limonja v. Commonwealth, 8 Va. App. 532, 538, 383 S.E.2d 476, 480 (1989) (en banc) (quoting Maryland v. Macon, 472 U.S. 463, 470-71 (1985)). While the principle is sound, it has no applicability in cases involving a homeowner's implied invitation to enter constitutionally protected property to contact the occupants of the home and, it appears, the principle has not been applied in such cases. Indeed, the very colloquialism used to refer to the exception, viz., "knock and talk,"

signifies subjective purpose as the effective analytical principle. Entry into the curtilage without

a warrant to search is wholly incompatible with Fourth Amendment jurisprudence,[13] and judicial

---

[13] The majority cites only two cases in support of its contention that an examination of the purpose underlying a police officer's entry onto the curtilage of private property is improper: Marasco, 318 F.3d 497, and Alvarez, 147 F.3d 354. A close reading of these cases establishes that neither supports the majority's conclusions. To the contrary, both decisions are rooted in an examination of the evidence establishing the police officer's subjective intent in entering the curtilage.

The court in Marasco found that where the police officers approached and knocked on the defendant's front door, and then telephoned his residence from the front door in an attempt to contact him, it was clear that the officers' purpose was to speak to the occupants in response to a complaint the police had received. Marasco, 318 F.3d at 520. Noting the lawfulness of that purpose, the Third Circuit then addressed whether, having received no answer to the knock at the front door, it was reasonable for the police to proceed to the backyard of the house and enter the garage. In reversing the trial court's grant of summary judgment, the Third Circuit determined that "there remain questions of fact as to whether the officers' intrusion into the curtilage was reasonable *in light of their asserted purpose in making their entry into Smith's property which was not to make a search*." Id. at 521 (emphasis added). The court emphasized that, to be lawful, the police objective must be "unconnected to any search for the fruits and instrumentalities of criminal activity." Id. at 520.

Similarly, in Alvarez, the Fourth Circuit emphasized that the officers entered the Alvarezes' property "*simply* to notify the homeowner or the party's host about the complaint and to ask that no one drive while intoxicated." Alvarez, 147 F.3d at 358-59 (emphasis added). In reaching its decision, the court cited, with approval, other cases standing for the proposition that the purpose for which an officer enters the curtilage is a paramount consideration. Id. That consideration persists whether the court must determine the propriety of the initial intrusion by implied invitation or whether it must determine the lawfulness of intrusions beyond the front door of the house. The latter analysis is likewise predicated on the reasonableness of the intrusions beyond the front door, examined in *light of the officer's original purpose, viz, to interview the occupants*.

In short, both cases stand for the proposition that entry into curtilage must be independent from any intent or purpose on the part of the police to conduct a general search for evidence of criminal conduct. Logically, whether the purpose of an intrusion into curtilage is unconnected to a search for evidence necessarily involves an examination of the officer's subjective intent, as established by the testimony or the evidence of police conduct presented. See supra notes 11-12 (demonstrating that courts determine the purpose of an intrusion into curtilage by examining evidence of officers' subjective intent).

Consistent with the theory that an officer's purpose, or subjective intent, is a determinative factor in assessing reasonableness is the requirement applied by other Circuit Courts of Appeals that an officer act in "good faith" before moving from the front door to contact an occupant of a house. See, e.g., Hammett, 236 F.3d at 1060 ("[A police officer] may, in good faith, move away from the front door when seeking to contact the occupants."); United States v. Raines, 243 F.3d 419, 421 (8th Cir. 2001) (holding that sheriff did not interfere with defendant's "privacy interest when he, in good faith, went unimpeded to the [rear of the home] to contact the occupants"). "Good faith" is defined, *inter alia*, as "[a] state of mind consisting in

validation of such a result under the aegis of an implied invitation rationale, applied in the abstract as suggested by the majority, "eviscerate[s] the principle of Oliver and Dunn that the curtilage is entitled to the same level of Fourth Amendment protection as the home itself." Rogers, 249 F.3d at 289.

In the instant case, not only is there no evidence that Cox was in the Robinsons' curtilage in order to go to their front door and speak to the occupants of the house, Cox's testimony makes clear that he entered the Robinsons' property in order to find evidence of a crime, viz., to surprise juveniles in the incriminating act of drinking beer and confirm his suspicion that the Robinsons were hosting an underage drinking party.[14]  Under the facts of this case, it cannot be said that Cox's purpose was "unconnected with a search."  See Alvarez, 147 F.3d at 358; Bradshaw, 490 F.2d at 1100.  I would therefore hold that Cox's entry into the curtilage violated the Robinsons' reasonable expectation of privacy and their rights under the Fourth Amendment to the United States Constitution.

I would further hold that Cox's observations of criminal activity from his vantage point in the curtilage were not admissible pursuant to the plain view doctrine because, as discussed above, Cox's entry into the curtilage of the Robinsons' home was not lawful.  See Hamlin v. Commonwealth, 33 Va. App. 494, 502, 534 S.E.2d 363, 367 (2000) (finding that in order for a search to come within the plain view exception, two requirements must be met:  "'(a) the officer

---

. . . honesty in belief or purpose."  Black's Law Dictionary 713 (8th ed. 2004).
Thus, the case law clearly recognizes and requires an inquiry into an officer's subjective purpose for being on the curtilage of a home.

[14] Cox testified that he "planned to enter the property to investigate the allegations of underage consumption of alcohol."  In addition, when asked if he was "looking for a reaction of people scattering to confirm [his] suspicion that [he] had an underage drinking party," Cox responded affirmatively.

must be lawfully in a position to view and seize the item, [and] (b) it must be immediately apparent to the officer that the item is evidence of a crime, contraband, or otherwise subject to seizure'" (citations omitted)), aff'd en banc, 35 Va. App. 373, 545 S.E.2d 556 (2001). Cox was not lawfully in a position to view the minors consuming alcohol. See id. Therefore, the trial court's admission of Cox's observations of juveniles drinking beer, which he made as a result of his illegal entry, cannot be affirmed on the ground that the evidence was in plain view.

For the reasons stated, I respectfully dissent.